OPINIONS OF THE SUPREME COURT OF OHIO

The full texts of the opinions of the Supreme Court of Ohio are being transmitted electronically beginning May 27, 1992, pursuant to a pilot project implemented by Chief Justice Thomas J. Moyer.

Please call any errors to the attention of the Reporter's Office of the Supreme Court of Ohio. Attention: Walter S. Kobalka, Reporter, or Justine Michael, Administrative Assistant. Tel.: (614) 466-4961; in Ohio 1-800-826-9010. Your comments on this pilot project are also welcome.

NOTE: Corrections may be made by the Supreme Court to the full texts of the opinions after they have been released electronically to the public. The reader is therefore advised to check the bound volumes of Ohio St.3d published by West Publishing Company for the final versions of these opinions. The advance sheets to Ohio St.3d will also contain the volume and page numbers where the opinions will be found in the bound volumes of the Ohio Official Reports.

The State of Ohio, Appellee, v. Lawson, Appellant.

[Cite as State v. Lawson (1992), Ohio St.3d .]

Criminal law -- Aggravated murder -- Death penalty upheld, when.

(No. 90-1342 -- Submitted May 19, 1992 -- Decided August 12, 1992.)

Appeal from the Court of Appeals for Clermont County, No. CA88-05-044.

On or about January 13, 1987, Cheryl Titus returned to her Clermont County home at around 5:00 p.m. to discover that burglars had broken in through her porch door. A microwave oven, VCR, checkbook and camera were stolen. Titus immediately contacted the police, who responded to the scene and took a report. An initial investigation disclosed no suspects. Later that same year, on June 1, 1987, the Titus residence was again burglarized. On this occasion, the intruders stole the same kind of items as before, which Titus and her husband had replaced with insurance proceeds.

Detective Randy Harvey, during the course of his investigation of the June 1, 1987 burglary, came into contact with Timothy Martin. Martin had on several prior occasions assisted the Clermont County Sheriff's Office as a confidential informant. After notifying Harvey that Tim Lawson and his brother, appellant Jerry R. Lawson, were involved in the Titus burglaries, Harvey arranged for a phone conversation between Tim Lawson and Martin to be recorded. Martin succeeded in obtaining a taped conversation wherein Tim Lawson discussed sale prices for items he and appellant had burglarized from the Titus residence. Subsequently, Detective Harvey sought an aggravated burglary indictment against Tim Lawson. Martin was later subpoenaed to appear before the grand jury on August 5, 1987, although it is not certain that he testified. The grand jury returned an indictment charging Tim Lawson with two counts of aggravated burglary. Tim Lawson was subsequently arrested and released on bond.

After Tim Lawson's release in late August or early September 1987, his brother, appellant, came to Tim's home. Tim Lawson's live-in girlfriend, Desiree Henson, testified that she overheard their conversation in which they discussed how "Tim Martin needed to be taken care of" and how they "had to

get rid of him" in order to prevent his testimony against them.  Henson also overheard the brothers indicate their intention of "taking him somewhere and whooping his butt ***."  In addition, they discussed how hard it would be "to get him [Martin] to go anywhere with Jerry."

During the morning of September 23, 1987, appellant arrived at the home of Tim Lawson, ostensibly to drive his brother to work.  The two traveled instead to the New Richmond, Ohio home of Billy and Sue Payton, siblings who were acquainted with Martin and the Lawsons.  There, the parties discussed their mutual hatred of Tim Martin "because of all the things he'd done to both of our families."  Supposedly, Martin had tried to kill Sue, his former girlfriend.  Martin, according to one witness, tried to "set up" Tim and his sister on criminal charges and had even threatened to "rip [the head] off" Desiree Henson's infant child.  During the course of this conversation, appellant grew angrier and angrier.

Knowing that Martin would be reluctant to go anywhere alone with appellant, the group decided to employ deception in order to lure Martin to a secluded area and give him a severe beating.  Billy suggested: "I can say I know where a pot field is ***."  Billy believed that this subterfuge would cause Martin to "get dollar signs in his eyes" and thereby lose his caution.  Billy phoned Martin, told him the agreed-upon story, and Martin was persuaded to meet with them.

At approximately 10:30 a.m. on that day, appellant, Tim, and Billy met with Martin and the four set off for the fictitious marijuana field.  Appellant drove the group through a number of back roads to a secluded spot in Highland County.  Once at the location, Martin was told that the marijuana was in a wooded area behind a nearby cornfield.  The four exited the vehicle and proceeded toward the wooded area, Martin still expecting to find a field of marijuana.  They arrived at a dry creekbed and all stopped to urinate.  After they finished, appellant, shaking badly, pulled a gun, pointed it at Martin and fired a shot from approximately nine feet behind, striking Martin.  The bullet perforated Martin's kidney, liver, and pancreas.  Appellant fired three more shots, all of which missed.

It took thirty to forty-five minutes for Martin to die of his wounds.  During this time, Martin asked appellant, "Why are you doing this to me?"  Appellant, enraged, cursed at Martin and screamed in response, "Why did you turn me in, why did you make tapes of me ***[?]"  Appellant also ranted about Martin's informing on Tim and Martin's behavior toward the Lawson family.  Martin continued to plead for help and begged appellant to take him to a hospital.  At one point, appellant went berserk and kicked Martin eight to ten times.  Additionally, appellant took Billy Payton's knife and offered it to Martin, saying, "Put yourself out of your own misery."  After Martin refused, appellant then offered the knife to Billy Payton and Tim Lawson, who declined to use the knife as suggested.

When Martin appeared to have stopped breathing, the group decided that he was dead.  Appellant ordered Tim and Billy to drag the body from the creekbed and hide it in a shallow hole made by the roots of a fallen tree.  He then directed the two

to cover Martin's body with debris and ordered the area searched for potential evidence. Before leaving the scene, appellant threw Payton on the ground, put the gun into his face and said, "You tell anybody and you're dead."

On September 26, 1987, Payton phoned FBI Special Agent Larry Watson and informed him that he had something "very important he had to get off his chest." Earlier that month, Payton had agreed to assist Agent Watson as an informant regarding an investigation of narcotics activity in the Clermont and Brown County areas. After hearing Payton's story, Watson took a detailed statement from him and also interviewed Payton's girlfriend and his sister Sue. Watson then enlisted the cooperation of Billy and Sue to secure a taped admission from appellant. Three days later, on September 29, Sue secured a taped conversation between herself and appellant. During this conversation, only a portion of which was played before the jury at appellant's trial, appellant complained about Martin "snitching" on people and threatening women and children. He also said he purposely shot Martin in the side so Martin would bleed internally and "die a slow death." Billy Payton later recorded a conversation with appellant in which appellant admitted to shooting Martin before he kicked and taunted him. Appellant also discussed going back to the burial site in order to "cut off his [Martin's] hands" and moving the body to a more secluded location. Appellant further said: "I've killed before, man, but everytime I've killed, man, you seen how I looked, man, I turned fuckin white, man, fuckin start sweating and shit, felt sick." Billy replied, "No, you turn into a wild man." Appellant said, "Hey, I can psych myself out now."

On October 6, 1987, appellant was indicted on two counts of aggravated murder, three counts of kidnapping, two counts of intimidation, aggravated robbery, aggravated burglary, and gross abuse of a corpse. All counts with the exception of the gross abuse of a corpse carried specifications. He entered pleas of not guilty and not guilty by reason of insanity. On April 26, 1988, a jury convicted appellant of both aggravated murder counts and of three specifications as to each count: murder during kidnapping, R.C. 2929.04(A)(7); murder for the purpose of escaping accountability for another offense, R.C. 2929.04(A)(3); and murder of a witness, R.C. 2929.04(A)(8). Appellant was also found guilty of two counts of kidnapping, two counts of intimidation, and one count of aggravated burglary. Appellant was found to have had a firearm on or about his person while committing the offenses.

After the conclusion of the mitigation phase of the trial, the jury found that the aggravating circumstances outweighed any mitigating factors and, therefore, recommended the sentence of death. The trial court adopted the jury's recommendation and imposed a sentence of death as to the aggravated murder charges. The court of appeals affirmed appellant's conviction and the death penalty.

This cause is before the court upon an appeal as of right.


Donald W. White, Prosecuting Attorney, and David Henry Hoffmann, for appellee.

H. Fred Hoefle and Kenneth J. Koenig, for appellant.

Holmes, J.   Appellant has raised twelve propositions of law.  Each has been thoroughly reviewed and for the reasons stated below we find them without merit, and uphold the appellant's convictions and death sentence.

I

Appellant's second, third and fourth propositions of law are interrelated.  They stem from the admission into evidence of a tape-recorded conversation between appellant and Billy Payton.  The portion played to the jury contained the following passage:

"Lawson:  Number one is this, *** he fucked you around, your sister around, the kids around, a lot of people around him he fucked, my little brother around, my sister, he tried *** to fuck me around, *** that shit don't go, not with me, you know.  I've killed before man, but everytime I've killed, man, you seen how I looked, man, I turned fuckin white, man, fuckin start sweating and shit, felt sick.

"Payton:  No, you turn into a wild man.

"(Laughter)

"Lawson:  Hey, I can psych myself out now.  I can psych myself out, man, that's I've been down that road a few times, like this here. ***"  (Emphasis added.)

Before the tape was played to the jury, defense counsel and the prosecutor met with the trial judge in chambers to discuss its admissibility.  Initially, defense counsel asked that the above emphasized language be redacted as unfairly prejudicial.  Defense counsel later maintained that only the words "I've killed before, man, but everytime I've killed, man" required redaction.  The trial judge asked the defense to state its position for the record; counsel asked for a chance to consult with appellant.

After a recess, defense counsel stated that, having consulted appellant, "we do not seek an expungement."  Defense counsel thought it "good strategy" to let the jury hear the whole exchange and also declined a cautionary instruction because it might draw undue attention to the "I've killed before" statement.

In his second proposition of law, appellant maintains that the reference to prior killings should have been redacted as irrelevant, unfairly prejudicial, and inadmissible under Evid.R. 403 and 404(B).  However, the defense waived any error by withdrawing its objection.  Even in capital cases, this court has applied the doctrine of waiver to bar the defendant from raising on appeal those issues which had gone unchallenged in the courts below.  See, e.g., State v. Bradley (1989), 42 Ohio St.3d 136, 140, 538 N.E.2d 373, 378.

In his third proposition of law, appellant argues that he was deprived of his right to the effective assistance of counsel when his trial attorneys withdrew their objection to the "I've killed before" statement.  We find this argument to be without merit.  The United States Supreme Court has stated that in order to prevail on this claim, the defendant must show both deficient performance and resulting prejudice.  Strickland v. Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693.  As to the performance inquiry, the defendant must demonstrate "that counsel made errors so serious

that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. The prejudice component of the Strickland test "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.

Appellant maintains that since it was not a legitimate trial strategy to permit the jury to hear appellant's boastful comments that he had killed before, counsel's performance was "ineffective" under the first prong of Strickland. To prevail, appellant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ***." Id. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id.

Under the circumstances, we conclude that appellant's lawyers did not act incompetently in withdrawing their objection to the "I've killed before" statement. Since appellant stipulated that he shot Martin, the only issue contested at trial was his mental state. Appellant's defense team's trial strategy was to prove appellant's innocence by reason of his insanity. To this end, his attorneys called as a witness Dr. John Peter Lutz, a psychiatrist, who testified that Lawson suffered from "brief reactive psychosis," a temporary form of insanity. Dr. Lutz testified that "[p]sychosis means as a result of a mental or physical illness a person is unable to perceive the circumstances around him in such a way as to guide their internal conception of what is occurring or to make reasonable assessments." Dr. Lutz opined that appellant's statement that "I've killed before" supported his psychiatric diagnosis because it evidenced appellant's alleged penchant for exaggeration and empty boasting.

Moreover, the "I've killed before" statement also supported Lutz's diagnosis by providing the necessary context for Payton's response: "No, you turn into a wild man." The "wild man" comment bolstered appellant's insanity defense but would be rendered meaningless without the preceding statement.

As for counsel's failure to ask for a cautionary instruction, he explained that he did so to avoid calling "undue attention" to the prejudicial nature of "I've killed before." This, too, does not seem to be unreasonable.

Having found that trial counsel's performance was not deficient as it bore a reasonable relationship to a legitimate trial strategy, we need not examine whether appellant has shown prejudice in the guilt phase of the trial.

Appellant's fourth proposition of law concerns an alleged deprivation of the effective assistance of appellate counsel. Appellant contends that his appellate counsel erred by failing to raise on appeal the admissibility of the "I've killed before" statement. Since we have already determined that the trial judge did not commit reversible error by allowing the jury to hear the statement, we conclude that appellant's fourth proposition of law has no merit.

II

Appellant's sixth proposition of law alleges that the

trial court erred in failing to order the state to disclose statements or notes taken during interviews with the Paytons or to review the statements or notes in camera for possible "Brady material."  In Brady v. Maryland (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215, 218, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

On January 4, 1988, the defense filed a motion to compel the prosecuting attorney to produce for the trial court's in camera inspection "all statements made by William S. Payton and Sue Payton, including memorandum or summaries of such statements and written or recorded statements, to law enforcement officers and prosecuting attorneys" to determine whether such statements contained Brady material.  The prosecutor responded by indicating that the files had been reviewed and no Brady material was found to exist that had not been previously disclosed during discovery.  During pretrial hearings, defense counsel demanded Agent Watson's FBI reports on his contacts with the Paytons.  The prosecutor replied that he had not seen these reports, had no control over them, and therefore could not turn them over.  The court, nevertheless, ordered the prosecutor to ask Watson whether the reports contained "Brady material."  The prosecutor obeyed and reported that Watson knew of none.

Also at issue were the contents of the prosecutor's notes taken from interviews with the Paytons.  Although the prosecutor believed there was "absolutely nothing" favorable to the defense in his notes, he offered to meet the judge ex parte to "alert [him] to several matters in these notes and let him make a decision as to whether or not those matters are favorable ***."  The judge was willing to review the notes, but refused to meet with the prosecutor ex parte.  The prosecutor then declined to submit his notes for in camera review, but he placed the sealed notes in the record for appellate review.

Essentially, appellant argues that, at all relevant times, due process requires the trial judge to conduct an in camera inspection to determine whether material held by the prosecution contains exculpatory evidence.  After reviewing the authorities, we decline to so hold.  In Pennsylvania v. Ritchie (1987), 480 U.S. 39, 59, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40, 59, the United States Supreme Court stated:

"In the typical case where a defendant makes only a general request for exculpatory material under Brady ***, it is the State that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final."  (Emphasis added and footnote omitted.)

Therefore, the prosecution, not the trial judge, bears the duty to examine documents for potential Brady material."  In State v. Patterson (1971), 28 Ohio St.2d 181, 182-183, 57 O.O.2d 422, 423, 277 N.E.2d 201, 203, we found that, after the defendant's general request for exculpatory material, the prosecution's review and representation to the court that none

exists is sufficient to satisfy Brady.  See, also, United States v. Presser (C.A.6, 1988), 844 F.2d 1275, 1281: "[W]hile the Brady rule imposes a general obligation upon the government to disclose evidence that is favorable to the accused and material to guilt or punishment, the government typically is the sole judge of what evidence in its possession is subject to disclosure."

In United States v. Bagley (1985), 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494, the United States Supreme Court expounded on the "materiality" of evidence in a Brady context:

"The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

See, also, United States v. Agurs (1976), 427 U.S. 97, 109-110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342, 353: "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."  (Emphasis added.)

A given Brady request may be in such form that it indicates to the prosecutor exactly what the defense is after. Agurs, supra, at 106, 96 S.Ct. at 2399, 49 L.Ed.2d at 351.  For instance, in Brady, the defendant sought the disclosure of his accomplice's extrajudicial statements in order to demonstrate that it was actually the accomplice, and not Brady, who strangled the victim.  Brady, supra, at 84, 83 S.Ct. at 1195, 10 L.Ed.2d at 217.  See, also, Agurs, supra, at 104-105, 96 S.Ct. at 2398, 49 L.Ed.2d at 350.  In other cases, a Brady request may not be particularized, e.g., the defense makes a general demand for either "all Brady material" or "anything exculpatory."  Agurs, supra, at 106, 96 S.Ct. at 2399, 49 L.Ed.2d at 351.

In the case sub judice, appellant requested specific material.  Ritchie suggests that a specific request will sometimes require the trial court to review the contested matter in camera to determine whether it is material or exculpatory despite representations to the contrary by the prosecutor.  Ritchie, supra, 480 U.S. at 58, 107 S.Ct. at 1002, 94 L.Ed.2d at 58, fn. 15.  However, regardless of whether the request in this case is classified as a general request for exculpatory material1 or one for disclosure of specific material, we conclude the trial court's failure to conduct an in camera inspection was not reversible error.  Although the trial court did not review the prosecutor's notes, they are in the record for appellate review.  Since the trial court is in no better a position than a reviewing court to recognize Brady material, a reviewing court's examination is a fair substitute for in camera inspection at trial.  The court of appeals examined the notes and found that they contained nothing favorable to the defense.  After conducting our own review of the prosecutor's notes, we find they do not contain any additional evidence material to appellant's guilt or punishment.  Also, whatever may be considered even remotely favorable to the accused had been disclosed to the defense

through other means.  Accordingly, any supposed error in the trial court's failure to examine was harmless.

Furthermore, we find no error with respect to the FBI reports even though they are not in the record and have not been reviewed by any court.  Under Brady, the government's obligation to disclose evidence favorable to the defendant and material to guilt or punishment applies only to that evidence which is "in its possession."  Ritchie, supra, at 57, 107 S.Ct. at 1001, 94 L.Ed.2d at 57.  Obviously, if the prosecutor had no control over the FBI reports, he is incapable of suppressing them in violation of Brady.  Here, the record reflects that the FBI reports were never in the state of Ohio's possession -- they were compiled by a separate sovereign, the United States of America, and their contents were never disclosed to the prosecution.  Although Agent Watson may have assisted the state's investigation, his relationship to the state of Ohio in this case was no more than that of any citizen and his knowledge of potential "Brady material" cannot automatically be ascribed to the state.  See State v. Wiles (1991), 59 Ohio St.3d 71, 78, 571 N.E.2d 97, 110.  See, generally, State v. Mollica (1989), 114 N.J. 329, 348-350, 554 A.2d 1315, 1325-1326.  Therefore, we hold that since the FBI reports were not in the state's possession, they were not subject to Brady, and no in camera review was required.

Accordingly, we overrule appellant's sixth proposition of law.

### III

Appellant's seventh proposition of law claims as error the failure of the state to record the proceedings of the grand jury that indicted him.

In State v. Grewell (1989), 45 Ohio St.3d 4, 543 N.E.2d 93, syllabus, we held that grand jury proceedings in felony cases must be recorded pursuant to Crim. R. 22.  However, nonrecordation will be deemed harmless error where the defendant fails to show a "particularized need for *** grand jury testimony which outweighs the need to maintain grand jury secrecy."  Id. at 9, 543 N.E.2d at 98.  See, also, State v. Greer (1981), 66 Ohio St.2d 139, 20 O.O.3d 157, 420 N.E.2d 982, paragraph two of the syllabus.

Appellant challenges the court of appeals' assumption that the prosecutor had represented to the trial court that Billy Payton did not testify before the grand jury.  After reviewing the record, we find that appellant's challenge is well grounded.  The prosecutor never said Billy Payton didn't testify; he only said no transcript of Billy's testimony existed.  It is therefore incumbent on this court to determine whether appellant has demonstrated a particularized need to examine grand jury transcripts.

We held in Greer that if the defendant is able to demonstrate a particularized need, i.e., where the surrounding circumstances indicate a probability that the failure to disclose the grand jury testimony will deprive the defendant of a fair trial, grand jury proceedings may be disclosed.  Id. at paragraph three of the syllabus.  If the defendant demonstrates a particularized need, Crim. R. 6(E) gives him or her the right to inspect all relevant portions of grand jury testimony.  Id., 66 Ohio St.2d at 150-151, 20 O.O.3d at 164-165, 420 N.E.2d at

989.  Also, "[t]he question of whether a particularized need exists is within the discretion of the trial court."  Grewell, supra, 45 Ohio St.3d at 9, 543 N.E.2d at 98.

Appellant's brief to this court cites no specific facts from the record to support his particularized-need claim.  Additionally, we have reviewed his brief submitted to the court of appeals where he asserts that the specific circumstances proved particularized need to obtain Billy Payton's grand jury testimony.  We conclude that appellant has failed to show particularized need and, consequently, the failure to record the grand jury proceedings was harmless error.  Accordingly, we reject appellant's seventh proposition of law.

IV

In his ninth proposition of law, appellant claims that the state's decision not to prosecute the alleged co-conspirators, William and Sue Payton, constituted selective prosecution in violation of state and federal due process protections.  Appellant's argument is entirely without merit.

This court in State v. Flynt (1980), 63 Ohio St.2d 132, 17 O.O.3d 81, 407 N.E.2d 15, adopted the following test to judge selective-prosecution claims:

"'To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least prima facie, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.'"  Id. at 134, 17 O.O.3d at 82, 407 N.E.2d at 17, quoting United States v. Berrios (C.A.2, 1974), 501 F.2d 1207, 1211.

Appellant fails to satisfy both necessary prongs of this test.  First, he made no showing that "others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him ***."  Id.  Instead, appellant points solely to the nonprosecution of the Paytons.  Moreover, the Paytons are not "similarly situated" because they did not kill or attempt to kill Martin.  Second, appellant has failed to demonstrate that his prosecution was based upon "impermissible considerations."  Id.  He asserts that the state chose to forgo prosecution of the Paytons in order to conceal Brady material.  Again, appellant fails to supplement his proposition of law with any facts and asks that we assume that he was deprived of information material to his guilt or punishment by the state's failure to record the grand jury proceedings.  We cannot infer from such an empty argument that the state's motive for nonprosecution was to conceal the Paytons' statements.  However, we can infer from concrete facts that the state acted in good faith in not prosecuting the Paytons: the evidence indicated that the Paytons planned for Martin to be beaten up, not killed; Billy Payton refused to attack the dying victim with the knife offered to him by appellant; the Paytons reported the murder to Agent Watson and both fully cooperated in his investigation.

Appellant has failed to establish selective prosecution and we therefore reject his ninth proposition of law.

                                    V

In his first proposition of law, appellant argues that certain comments made by the prosecutor during his penalty phase closing argument were improper because they appealed to the jury's passion and prejudice. The first of two prosecutorial comments reads as follows:

"Now, we heard from the defendant's mother. And, you know, this is very uncomfortable for me to speak about because I think you, just like I have, have watched the vigil that woman has kept for well going on to 40 days now. She quietly sat back there and supported this man. And I can't help and I haven't been able to help for 40 days to think about my own mother and when my father died and I watched her suffer and more so than me grieving over the death of my father, I watched my mother suffer and that hurt. And when she took that stand I hurt for Mrs. Lawson, and you can't deny that there is anyone that wasn't affected, and I saw a number of you cry and because I'm out here and I'm an attorney and this is my business I fought back the tears and I swallowed hard and there was only one person in this courtroom who didn't and it's that man right there. And if anybody took the time to look over at him like I did and saw the reaction that he had to his own mother on that stand, it was chilling. And I want you to carry that with you when you weigh the aggravating circumstances versus the mitigating factors." (Emphasis added.)

The trial court overruled appellant's immediate objection and denied his motion for mistrial. The judge, however, did instruct the jury that the prosecutor's remarks are not evidence. Appellant now argues that the death sentence is unreliable because the foregoing remarks constituted an improper comment on his demeanor at trial which had the prejudicial effect of implying that appellant was so cold and callous that he was unaffected by his mother's tearful pleas for his life. We disagree. In State v. Brown (1988), 38 Ohio St.3d 305, 317, 528 N.E.2d 523, 538, we held that "[a] defendant's face and body are physical evidence" and that it is permissible for the prosecution to comment on the accused's physical appearance. Even if the prosecutor's remarks were improper, we do not conclude that appellant was thereby prejudiced. "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." State v. Smith (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 318, 470 N.E.2d 883, 885. "In general terms, the conduct of a prosecuting attorney during trial cannot be made a ground of error unless that conduct deprives the defendant of a fair trial." State v. Maurer (1984), 15 Ohio St.3d 239, 266, 15 OBR 379, 402, 473 N.E.2d 768, 793. Reversal of appellant's death sentence is not required where it is clear beyond a reasonable doubt that the jury would have recommended this penalty even absent the prosecutor's improper remarks. State v. Beuke (1988), 38 Ohio St.3d 29, 33, 526 N.E.2d 274, 280. We find that appellant incurred no prejudice as a result of the prosecutor's remarks because, as will be discussed later in this opinion, we find that the aggravating circumstances

clearly outweigh the mitigating factors even in the absence of these prosecutorial comments.

We reach the same result with regard to the second comment made by the prosecutor.2  While appellant's trial counsel did not object or request a cautionary instruction, the court of appeals decided the issue on its merits and rejected it.  Since we find that the outcome of the penalty phase would have been the same even had the prosecutor refrained from making this comment, we regard any alleged error as harmless.

Accordingly, we reject appellant's first proposition of law.

## VI

In his tenth proposition of law, appellant argues that the separate animus necessary to support a separate conviction for kidnapping does not exist in this case and, therefore, the kidnapping cannot stand as a specification in the aggravated murder conviction.  We disagree.

Under R.C. 2941.25, a defendant may be convicted and sentenced for two or more offenses "having as their genesis the same criminal conduct or transaction, provided that the offenses (1) were not allied and of similar import, (2) were committed separately or (3) were committed with a separate animus as to each offense."  State v. Moss (1982), 69 Ohio St.2d 515, 519, 23 O.O.3d 447, 450, 433 N.E.2d 181, 185.

In State v. Logan (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, we set forth guidelines to determine whether, pursuant to R.C. 2941.25(B), kidnapping and another offense of the same or similar kind are committed with a separate animus as to each.  One of those guidelines states:

"Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions."  Id. at syllabus.

See, also, State v. Powell (1990), 49 Ohio St.3d 255, 552 N.E.2d 191: "'[W]here murder *** is the underlying crime, a kidnapping in facilitation thereof would generally constitute a separately cognizable offense.'"  Id. at 261, 552 N.E.2d at 198, quoting State v. Logan, supra, 60 Ohio St.2d at 135, 14 O.O.3d at 379, 397 N.E.2d at 1352.

In the case sub judice, the record indicates prolonged restraint and significant movement; Martin was transported for several hours over a great distance involving three counties.  The prolonged deception over several hours was not incidental to Martin's murder and clearly constituted a separate and distinct act.  Accordingly, appellant's tenth proposition of law is without merit.

## VII

In his twelfth proposition of law, appellant claims the trial judge erred in the penalty phase by refusing appellant's request to instruct the jury that "[r]easonable doubt is present when you're not firmly convinced that death is the appropriate punishment."  Appellant's argument is without merit.

R.C. 2929.03(D)(2) requires the jury to "determine whether

the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case.  If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender.  ***"  (Emphasis added.)

The trial court properly instructed the jury on reasonable doubt according to the definition set forth in R.C. 2901.05(D).  The statutory language requires the jury to balance aggravation and mitigation; it does not empower the jury to decide, without regard to that balance, whether the death sentence is "appropriate."  Since the instructions given adhered as closely as possible to the language of R.C. 2901.05(D), they were both proper and sufficient.  Accordingly, appellant's twelfth proposition of law is overruled.

VIII

Appellant's fifth and eleventh propositions of law raise issues which have been repeatedly raised in other death penalty cases before this court.3  See, e.g., State v. Jenkins (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264.  "R.C. 2929.05 requires this court to review capital cases in a certain manner but does not require this court to address and discuss, in opinion form, each and every proposition of law raised by the parties."  State v. Bonnell (1991), 61 Ohio St.3d 179, 181, 573 N.E.2d 1082, 1085.  As our position on these issues remains unchanged, we will not waste valuable judicial resources discussing what continues as well-settled law.

IX

Having considered appellant's propositions of law, we must independently weigh the aggravating circumstances against the factors presented in mitigation as required under R.C. 2929.05(A).

Appellant was convicted of two aggravated murder counts; since both involve the same victim, they merge.  As to each count, appellant was convicted of three aggravating circumstances: murder during kidnapping, R.C. 2929.04(A)(7); murder to escape detection, apprehension, conviction, or punishment for the Titus burglary, R.C. 2929.04(A)(3); and murder of a witness to prevent his testimony, R.C. 2929.04(A)(8).  The aggravating circumstances for Count One also merge into those for Count Two.  We find that the aggravating circumstances were proven beyond a reasonable doubt.

Against these aggravating circumstances we weigh all mitigating factors drawn from the nature and circumstances of the offense; the history, background, and character of appellant; and any other factors listed in R.C. 2929.04(B)(1) through (7) which exist in this case.  One strong mitigating factor potentially applicable is contained in R.C. 2929.04(B)(3), which requires consideration of "[w]hether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law[.]"

At trial, appellant presented the testimony of one psychiatrist, Dr. John Lutz.  According to Dr. Lutz, appellant

suffered from a "brief reactive psychosis" when he fatally shot and beat the victim. Dr. Lutz explained that a brief reactive psychosis is a sudden, temporary psychosis, or detachment from reality, lasting between a few hours and two weeks, characterized by emotional turmoil and rapid mood shifts. Such a psychosis may be triggered by a "major stress"; in appellant's case, Lutz believed, stress was caused by appellant's ruminating over what the Paytons told him about Martin's behavior. Lutz concluded that appellant's "ability to distinguish right from wrong was markably [sic] impaired, and *** he was unable to refrain" from shooting Martin.

The prosecution presented the testimony of one psychiatrist and two psychologists. All disagreed with Lutz's diagnosis.

Another potential mitigating factor is appellant's heavy drug and alcohol consumption prior to the murder. Any impact, however, is weakened by the fact that appellant had no difficulty driving to the murder scene.

The Paytons' role in this crime constitutes another possible mitigating factor. See R.C. 2929.04(B)(2) and (7). The Paytons made inflammatory statements about Martin's behavior toward the Lawson family. Specifically, they told appellant that Martin had "set up" appellant's sister on false charges. According to the Paytons, police relying on Martin's false accusations searched appellant's sister's house and placed a gun against the head of her ten-year-old daughter. The Paytons also said that Martin threatened to kill appellant's family and "rip [the head] off" Desiree Henson's baby. Because appellant was highly suggestible, intensely loyal to and protective of his family and eager to please his family and friends, the Paytons' allegations infuriated appellant.

While the record demonstrates that the Paytons manipulated appellant to achieve their own ends, evidence also indicates that appellant hated Martin even before he spoke to the Paytons. In addition, no evidence shows that the Paytons suggested murder; that was appellant's idea alone. He brought the gun, he drove the car, and he gave the commands.

We therefore give appellant's personal weaknesses (suggestibility, low intelligence, impulsiveness) little weight in reducing his culpability. Also, we reject Dr. Lutz's diagnosis of appellant as suffering from "brief reactive psychosis" as did most of the experts.

Appellant murdered Martin to prevent his testimony against Tim Lawson and to prevent appellant's own apprehension, conviction, and punishment for the Titus burglary. These aggravating circumstances strike against the judicial system itself and deserve severe punishment. Moreover, appellant murdered Martin during the course of a kidnapping. The lack of violence in the kidnapping arguably reduces the weight of the specification, but does not eliminate it.

Having conducted the statutory balancing, we conclude that the aggravating circumstances outweigh the factors presented in mitigation beyond a reasonable doubt.

X

Our final task is to determine whether the sentence of death is appropriate in this case. In his eighth proposition

of law, appellant argues that the death penalty in this case is disproportionate because the Paytons were the principal offenders in the Martin murder, but were never even indicted for the offense.

This proposition lacks merit for two reasons. First, its premise -- that the Paytons were the principal offenders -- is invalid. The "principal offender" in a capital case is whoever "personally performed every act constituting the offense of aggravated murder. ***" State v. Sneed (1992), 63 Ohio St.3d 3, 12, 584 N.E.2d 1160, 1168. Appellant concedes that he was the trigger man. Second, the alleged crimes of people who were never tried, let alone convicted and sentenced to death, are not "similar cases." R.C. 2929.05(A). See State v. Steffen (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

After conducting a proportionality review and comparing Lawson's case with others, we find that Lawson's death sentence is appropriate and not excessive. This court has upheld death sentences in cases where the only death penalty specification was murder during a kidnapping. See, e.g., State v. Morales (1987), 32 Ohio St.3d 252, 513 N.E.2d 267. We have also upheld death sentences in cases involving witness murder, see State v. Hooks (1988), 39 Ohio St.3d 67, 529 N.E.2d 429, and murder to avoid detection, apprehension, trial, or punishment for another offense, see State v. Wickline (1990), 50 Ohio St.3d 114, 552 N.E.2d 913.

Accordingly, the judgment of the court of appeals is affirmed.

Judgment affirmed.

Moyer, C.J., Sweeney, Douglas, Wright, H. Brown and Resnick, JJ., concur.

FOOTNOTES:

1 The defendant in Patterson, supra, made a general request by moving for "discovery of 'all exculpatory evidence contained in the files of the prosecutor or personally known to' him, which [defense] counsel had no 'way of knowing about.'" Id., 28 Ohio St.2d at 182, 57 O.O.2d at 422, 277 N.E.2d at 203.

2 This comment reads as follows:

"And let's consider the mitigation hearing he [the victim] got in the back of that cornfield on September 23rd, 1987, when he wasn't too proud to beg for his life. And nobody stepped forward to help him and one man kicked him in the head like a football until he quit breathing. So, consider that for whatever mitigation you might want to and finally consider what this man told Dr. Lutz, 'If I had the chance I would do it again.'"

3 Appellant's six-part fifth proposition of law challenges the validity of the Ohio death penalty statutes and reads as follows:

"The Ohio death penalty statutes are unconstitutional, violating the Eighth Amendment proscription of cruel and unusual punishments, the Fourteenth Amendment guarantees to due process of law and to the equal protection of the laws, and also violating the concomitant provisions of the Ohio Constitution.

"(A) The death penalty is so totally without penological

justification that it results in the gratuitous infliction of suffering, and that consequently, there is no rational state interest served by the ultimate sanction.

"(B) The use of the same operative fact to first elevate what would be 'ordinary' murder to aggravated murder, and then to capital, death-eligible aggravated murder permits the state (1) to obtain a death sentence upon less proof in a felony murder case than in a case involving prior calculation and design, although both crimes are ostensibl[y] equally culpable under the Revised Code, and (2) fails to narrow the capital class to those murderers for whom the death penalty is constitutionally appropriate.

"(C) The requirement that a jury must recommend death upon proof beyond a reasonable doubt that the aggravating circumstances outweigh only to the slightest degree the mitigating circumstances renders the Ohio capital statutes quasi-mandatory and permits the execution of an offender even though the mitigating evidence falls just short of equipoise with the aggravating factors, with the result that the risk of putting someone to death when it is practically as likely as not that he deserves to live renders the Ohio capital process arbitrary and capricious, and, in the absence of a requirement that, before death may be imposed, aggravating factors must substantially outweigh mitigating factors, unconstitutional. [Emphasis sic.]

"(D) The Ohio capital statutes are constitutionally infirm in that they do not permit the extension of mercy by the jury even though aggravating factors may only slightly outweigh mitigating factors.

"(E) The provisions of Crim.R. 11(C)(3) permitting a trial court to dismiss specifications upon a guilty plea only under the nebulous and undefined concept 'in the interests of justice' (1) needlessly encourages guilty pleas and the concomitant waiver of the right to jury, to compulsory process and to confrontation and (2) reintroduces the possibility that the death sentence will be imposed arbitrarily and capriciously.

"(F) The Ohio capital sentencing scheme is unconstitutional because it provides no standards for sentencing or review at several significant stages of the process and consequently death sentences are imposed, and reviewed, without sufficient statutory guidance to juries, trial courts and reviewing courts to prevent the unconstitutional arbitrary and capricious infliction of the death penalty."

In his eleventh proposition of law, appellant argues that he should have been allowed to present closing arguments first and last in the penalty phase. This court has long rejected that argument. See State v. Jenkins (1984), 15 Ohio St.3d 164, 214-215, 15 OBR 311, 354-355, 473 N.E.2d 264, 307-308; State v. Rogers (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph six of the syllabus.