OPINION.
The defendant-appellant, Darryl Turner, appeals his conviction, following a jury trial, for aggravated robbery, robbery, felonious assault, and kidnapping. In six assignments of error, Turner argues that (1) the trial court erred in failing to grant his motion to suppress evidence, (2) the admission of hearsay evidence violated his Sixth Amendment right to confront witnesses, (3) his conviction was based upon insufficient evidence and contrary to the weight of the evidence, and (4) he was denied effective assistance of counsel. We find no merit in any of the assignments and thus affirm.
 FACTS
Thomas Norton, a University of Cincinnati student, began drinking with friends at three o'clock in the afternoon on February 10, 1999. By his own estimation, he proceeded to consume about twenty beers as he continued to drink throughout the day. At approximately 2:30 a.m. the next morning, in a state of extreme intoxication, he left his friends outside a restaurant near the university, turning down an offer of a ride, and began walking back to his apartment. He testified that he had a twenty-dollar bill in his money clip, which he carried in a backpack slung over his shoulders.
According to Norton, Turner approached him on the sidewalk, commented on his drunkenness, and offered to help him along his way. Norton, aware of his own state of inebriation, accepted Turner's offer. Norton testified that Turner kept talking to him as they walked until Norton, in a moment of lucidity, realized that he was in an unfamiliar area. He testified that he became worried, and a little scared, when suddenly he experienced a bright flash and lost consciousness. Norton refuted the notion that he could have simply fallen, stating, "No, I don't recall falling. If I had fallen, it had to be with somebody's help. I know that I didn't just fall."
Cincinnati Police Officer Donald Meece testified that he was patrolling in the area with his partner, Officer Jeff McKinney, in the early morning hours of February 11, 1999, when their unit was dispatched to a domestic-violence complaint. As they were investigating the complaint, Officer Meece and his partner spotted a white male, obviously drunk, and an African-American male walking arm-in-arm on the opposite side of the street. At trial, Officer Meece identified the two men as Norton and Turner.
Several minutes later, after transporting a suspect in the domestic-violence case, the officers were approached by two African-American females who advised them that there was a person, "possibly dead," who had been beaten by another person in front of 3402 Harvey Avenue, approximately two blocks away. The officers responded to the location. According to Officer Meece, they drove around the location until he got out of the cruiser and began to inspect the bushes near an abandoned house known to him for being frequented by drug dealers and prostitutes.
Officer Meece testified that he heard movement in the house while inspecting the bushes. Upon shining his light into the building, he heard someone starting to run inside. He then moved outside the building in the direction of the noise and saw Turner coming out of a window. Officer Meece testified that he ordered Turner to stop, but that Turner retreated back into the house.
According to Officer Meece, Turner was next spotted trying to exit from a second-story window, but he again darted back in the house. Within the next few minutes, however, Turner came out of the house with his hands up. Officer Meece testified that he was operating at this point upon a report that someone was possibly dying — maybe dead — and that he was concerned about Turner having a weapon. Turner was therefore ordered to the ground at gunpoint and handcuffed. While Turner was on the ground, and before he was read his Miranda rights, Officer Meece asked Turner, "Where is the white guy that was with you?' He testified that Turner responded, "Oh, he left me. He got mad and took the bus."
At this point, Officer McKinney read Turner his Miranda rights. Officer Meece then asked Turner repeatedly about the whereabouts of the person who was with him and if that person was in the house. According to Officer Meece, Turner repeatedly told him that there was nobody in the house. Turner was then placed in a police vehicle and a search was made of the house with other officers who had arrived on the scene. Norton was found in one of the rooms, lying face down, unconscious, partly in a closet and partly on a pile of blankets, his face cut and bloodied. Officer Meece testified that when Officer McKinney checked for a pulse, Norton stirred and sat up. Officer Meece then asked Norton what had happened to him, to which Norton responded that "he was with this guy and the guy beat him up and took his money."
Officer Meece testified that Norton's backpack, still on his back, was unzipped. An ambulance was called and Norton was transported to the hospital. Turner was interviewed in the patrol car again, and again he stated that there had been no one in the house and that the person he had been with had left him and taken the bus. According to Officer Meece, Turner also said that Norton had fallen outside the house near some garbage cans, and that he had bled on the sidewalk. When both officers investigated the area around the garbage cans, however, neither saw blood. Officer Meece testified that Turner also alleged that he had first observed Norton at the corner of Harvey and Erkenbrecher. He stated that when he advised Turner that he had personally observed the two walking arm-in-arm two blocks farther south, Turner "pretty much clammed up."
No money was found on Turner, nor was Norton's twenty-dollar bill ever found on the premises. Although the police searched for a blunt instrument with blood on it inside the house, none was found.
Antonio Whitehead, a defense witness, testified that on the morning of February 11, 1999, he was sitting in his home on Harvey Avenue, watching television, when he heard "some arguing or some loud talk" outside of his window. He testified that, looking out the window, he saw two males, one white, one African-American, standing in his driveway. He described the African-American male as "trying to help" the white male, who was obviously intoxicated. He testified that he could hear the white male saying "leave me alone" and "get away from me." Whitehead stated that he then observed the white male "sprint out" and stumble all the way down the street until he "fell straight on his face."
According to Whitehead, the African-American male left the scene after the white male "kept saying, no, no." Sometime later, Whitehead testified, he witnessed two African-American females approach the white male's prone body and then begin to scream for help. Whitehead stated that when the two females then crossed the street to ask others to help, the African-American male came "back around the corner," picked Norton up, and then started walking down the street toward the abandoned house until they disappeared from his view. After that, he testified, the police began circulating in the area.
White testified that he did not know Turner and had had no previous contact with him.
 ANALYSIS
1. Motion to Suppress
In his first assignment of error, Turner argues that the trial court erred by denying his motion to suppress. The motion was directed to the statement that Turner made right after he left the abandoned house, while he was on the ground and being handcuffed, but before he was read his Miranda rights. Officer Meece testified that, having received a tip of a person either dead or dying, he peremptorily asked Tuner, "Where is the white guy that was with you?" To which Turner allegedly responded, "Oh, he left me. He got mad and took the bus."
Turner argues that this statement was obtained in violation ofMiranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, since it was in response to a question posed to him while he was in custody but before he had been read his rights.
As the state correctly argues, any error in the admission of this statement is harmless, as a matter of law, since Turner made an almost identical statement moments later, after he was read his Miranda rights. Thus, even if the first statement should have been excluded, the second statement, properly admitted, negated any possible prejudicial effect.
The state argues, furthermore, that the first statement was admissible under the "public safety" exception to Miranda, which allows the police, under certain circumstances, to temporarily forgo informing a suspect of his Miranda rights in order to ask questions necessary to quickly secure their own safety or the safety of the public. See New York v. Quarles (1984),467 U.S. 649, 104 S.Ct. 2626. In Quarles, the Supreme Court held that the police were entitled to ask a suspect, before reading him hisMiranda rights, the whereabouts of a gun he had only moments before discarded in a supermarket. The rationale of the court was that the police needed to secure the weapon promptly in order to make sure it did not end up in the hands of an accomplice, or otherwise threaten the general public. According to the Court, the "public safety" exception is "circumscribed by the exigency which justifies it" and does not depend upon "post hoc findings at a suppression hearing concerning the subjective motivation of the arresting officer." Id. at 656-658, 104 S.Ct. at 2631, 2632.
The questions asked under the "public safety" exception must be readily distinguishable from questions designed to elicit testimonial evidence from the suspect. Id. In this regard, the state points out that Officer Meece's question — "where is the white guy that was with you?" — was limited to Officer Meece's interest in discovering the whereabouts of Norton, whom he had reason to suspect had been badly beaten and was in need of immediate assistance. We agree with the state's position and hold that, under the facts of this case, the question fit within the narrow "public safety" exception to the Miranda rule.
Turner's first assignment of error is, therefore, overruled.
2. Hearsay Exceptions
In his second assignment of error, Turner argues that his Sixth Amendment right to confrontation was violated by the admission of certain hearsay evidence. The first such evidence was Officer Meece's testimony that two African-American women stopped him and his partner on the street to advise them that a man was being beaten, and was possibly dead, on Harvey Avenue.
"[E]xtra-judicial statements made by an out-of-court declarant are properly admissible to explain the actions of a witness to whom the statement was directed." State v. Thomas (1980),61 Ohio St.2d 223, 232, 400 N.E.2d 401, 408. Such statements are not admitted for their truth, but only as an explanation for the witness's conduct. Often such statements are admitted to explain the reasons for police investigation. In Thomas, for example, law enforcement officials were allowed to testify that their investigation was prompted by information they received about gambling.
In State v. Blevins (1987), 36 Ohio App.3d 147, 149,521 N.E.2d 1105, 1108, the Franklin County Court of Appeals ruled that the potential for abuse in admitting such statements requires the imposition of certain foundational requirements. The court held that such statements should only be admitted where the conduct to be explained is "relevant, equivocal and contemporaneous with the statements," and where their probative value is not outweighed by their potential for prejudice. Id., citing McCormick, Evidence (3 Ed. Cleary Ed. 1984), 732, 733, Section 249; 6 Wigmore, Evidence (Chadborun Rev.Ed. 1976), 267, 268, Section 1772; Evid.R. 403(A).
In the instant case, the information Officers Meece and McKinney received from the two African-American females was relevant to explain why they went to the scene of the crime and why they began such a diligent search of the area. The officers immediately acted upon the information. Without knowing why the officers were looking in the area of Harvey Avenue and inspecting the premises of the abandoned house, the jury would have been left to guess concerning the unexplained actions of the police. Concededly, the statement that a person was being "beaten" contains some potential for prejudice, since it goes to a disputed element of the crime — whether Norton suffered his injuries from falling down or as the result of an assault. However, because the two women did not in any way identify Turner as the person doing the beating, we hold that the relevance of these statements to explain the conduct of the police was not outweighed by their potential for prejudice.
Turner also alleges that his right to confrontation was violated by Officer Meece's testimony that, upon regaining consciousness in the abandoned house, Norton stated that the person he was with had beaten and robbed him. Norton did not have any personal recollection of this statement due to the suspension of his faculties. The trial court admitted Officer Meece's testimony, over objection, as an excited utterance pursuant to Evid.R. 803(2).
Evid.R. 803(B) excepts from the rule against hearsay statements "relating to a startling event or condition made while the declarant was under the stress of excitement cause by the event or condition." In order to invoke the exception, four elements must coalesce: (1) the occurrence of a startling event sufficient to make the declarant's statement unreflective and sincere, (2) the making of the statement before time to reflect, (3) a statement descriptive of the startling event, and (4) personal observation by the declarant of the event described. State v. Wallace (1988),37 Ohio St.3d 87, 89, 524 N.E.2d 466, 469. "A period of unconsciousness, even an extended period, does not necessarily destroy the effect of a startling event upon the mind of the declarant for the purpose of satisfying the excited-utterance exception to the hearsay rule." Id. at 90, 524 N.E.2d at 470. The question is whether the person upon awakening to consciousness, or in a state of semi-consciousness, lacked sufficient opportunity to gather his or her wits in order to fabricate.
Further, the fact that a person's statements are elicited by questioning does not necessarily negate the spontaneity of the declaration. "[T]he admission of a declaration of an excited utterance is not precluded by questioning which: (1) is neither coercive or leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties." Id. at 93,524 N.E.2d at 472.
When considering the trial court's decision to admit evidence under the excited-utterance exception, an appellate's court's role is circumscribed. Where the trial court's ruling on admissibility turns on a question of fact — i.e, whether the declarant was sufficiently startled to fit within the exception — the ruling should not be disturbed so long as it is reasonable. Id. at 90, 524 N.E.2d 469.
Here, according to Officer Meece, Norton was lying in a state of unconsciousness, or semi-consciousness, his face bloodied, in a debris-strewn abandoned house. Officer McKinney prodded him and he stirred. At that point, Norton was asked what had happened to him. We hold that that such a question was neither coercive nor leading, nor the type that would destroy the state of excitement inherent in the situation. Rather, the question merely facilitated Norton's statement.
As for Norton's response, that he was beaten and robbed, we hold that there was nothing unreasonable in the trial court's determination that it met all four elements of an excited utterance. The statement appears from the record to have been a spontaneous description of an event experienced by Norton before any period of reflection could have instilled an element of artifice. While one may question Norton's sobriety to have literally known what hit him, that determination was for the trial court, and we cannot say that its determination was unreasonable.
Turner's second assignment of error is, therefore, overruled.
3. Testimony as to the Nature of Norton's Wounds
In his third assignment of error, Turner argues that the trial court erred by allowing Officer Meece to testify that Norton's injuries appeared to be caused by a "blunt object," and also to give his opinion explaining the absence of blood on Turner's hands and clothes.
As the state correctly points out, no objection was made to this testimony, and therefore any cognizable error on appeal must constitute "plain error." Crim.R. 52(B); see State v. Fields
(1994), 97 Ohio App.3d 337, 646 N.E.2d 866. A reviewing court's power to review a claim of plain error is discretionary. Fields
at 344, 646 N.E.2d at 871. If a reviewing court exercises its discretion to employ a plain-error analysis, three requirements must be met: (1) an error must have been committed, (2) the error must have been plain error, and (3) the error must have resulted in prejudice. Id.
Here we choose not to exercise our discretion to employ a plain-error analysis, because any error in the admission of the evidence would have been committed by defense counsel, not by the trial court. The trial court was under no obligation to suasponte strike testimony elicited without objection. As the state points out, there may have been a strategic reason for defense counsel's failure to object that may have been thwarted had the trial court unilaterally interceded. We are convinced, therefore, that defense counsel's failure to object is more appropriately addressed under Tuner's sixth assignment of error, in which he claims ineffective assistance of counsel, and not under a plain-error analysis. The underlying issue of the testimony's admissibility was waived when defense counsel chose not to object to it. State v. Williams (1977), 51 Ohio St.2d 112,364 N.E.2d 1364.
4. Weight and Sufficiency of the Evidence
In his fourth and fifth assignments of error, Turner argues that his convictions were based upon insufficient evidence and were contrary to the weight of the evidence. Specifically, he argues that there was no showing that a robbery or an aggravated robbery was committed, because Norton was too drunk to state with certainty whether he had any money on him at the time of the alleged offenses; that there was no showing of a kidnapping; and, finally, that there was no showing that Norton's injuries were not self-inflicted as the result of a fall or clumsiness occasioned by his extreme drunkeness.
Turner's arguments largely turn upon the circumstantial nature of the evidence against him. As the Ohio Supreme Court has made clear, however, circumstantial evidence possesses the same probative value as direct evidence. State v. Jenks (1991),61 Ohio St.3d 259, 272, 574 N.E.2d 492, 502. In order to support a conviction, it is not necessary that circumstantial evidence be irreconcilable with any reasonable theory of innocence. As the court in Jenks explained
 Proceeding to consider the proper standard of appellate review, where the evidence is either circumstantial or direct, we conclude that the relevant inquiry on appeal is whether any reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. * * * [T]he relevant inquiry does not involve how the appellate court might interpret the evidence. Rather, the inquiry is, after viewing the evidence in the light most favorable to the prosecution, whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
Id. at 273, 574 N.E.2d at 503.
In the instant case, there was evidence that Turner had attached himself to Norton ostensibly to help him find his way back to his apartment. Norton testified that he was certain that he had twenty dollars in a money clip stashed in his backpack. Later, Norton realized that he was in strange surroundings and then experienced a bright flash and a sudden loss of consciousness. He specifically denied that he had fallen on his own. Later, acting on a tip about a man being beaten and possibly dead, the police found Turner frantically scrambling out of an abandoned house, and then darting back inside when ordered to halt. The process was repeated, and then Turner finally left the house, telling the police what was quickly proven to be a lie, that Norton had left the area by bus. Inside the building, the police found Norton in one of the rooms, unconscious or semi-unconscious, with bleeding wounds to both sides of his head. Immediately upon stirring and being asked what had happened to him, Norton exclaimed that the person he was with — i.e., Turner — had beaten and robbed him. As proof of this, the several pockets of the backpack he was wearing were unzipped, and the twenty-dollar bill he knew he had in the backpack was missing. Turner next compounded his earlier lie when, in the squad car, he told Officer Meece that he had first met Norton at the corner of Harvey and Erkenbrecher, whereas the officer and his partner had spotted him with Norton two blocks farther south.
The state's theory, obviously, was that Turner took advantage of Norton's state of extreme intoxication and deceived him into an isolated location, the abandoned house, where he could be beaten and robbed. Abductions by stealth or chicanery have been found sufficient to constitute kidnapping. See State v. Lawson (1992),64 Ohio St.3d 336, 595 N.E.2d 902 (driving the victim to visit an imaginary marijuana field); State v. Perkins (1994), 93 Ohio App.3d 672,639 N.E.2d 833 (victim misdirected to a park after volunteering to drive the defendant home); State v. Parks (1990),69 Ohio App.3d 150, 590 N.E.2d 300 (victim lured into defendant's apartment to examine television sets).
We hold that, with the record viewed in the light most favorable to the prosecution, there was sufficient circumstantial evidence for a reasonable person to accept the state's theory of the case and to find that Turner committed robbery, aggravated robbery, felonious assault and kidnapping upon Norton.
With respect to the weight of the evidence, Turner argues that the jury lost its way in failing to give superior weight to Whitehead's testimony that Norton fell and that Turner was merely trying to assist him. It is well settled that the trier of fact may reject all or part of a witness's testimony. Norton, as noted, disputed that he had simply fallen. Officer Meece and Officer McKinney were unable to find any blood around the garbage cans where Turner claimed that Norton had fallen. Significantly, Officer Meece testified that when he interviewed Whitehead on the scene, Whitehead told him that he had, in fact, witnessed an assault. Although Whitehead denied this, it was clearly the province of the jury to determine whether Officer Meece or Whitehead was telling the truth.
Upon review of the evidence, we hold that there was sufficient evidence to support Turner's convictions, and that the jury neither lost its way nor committed a manifest miscarriage of justice in reaching its verdicts on all the charges. Turner's fourth and fifth assignments of error are, therefore, overruled.
5. Ineffective Assistance of Counsel
In his sixth assignment of error, Turner asserts that he was denied his Sixth Amendment right to effective assistance of counsel when his attorney failed to object to Officer Meece's testimony attributing Norton's wounds to a blunt instrument and explaining away the lack of blood spatter on Turner's clothing.
In order to establish a claim of ineffective assistance of counsel, Turner must demonstrate not only that his trial counsel committed error, but that he was prejudiced by the error.Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052. In order to demonstrate prejudice, Turner must show that the alleged error probably affected the outcome of the trial; in other words that, but for the error, he probably would have been acquitted. State v. Bradley (1989), 42 Ohio St.3d 136,538 N.E.2d 373.
A reviewing court, furthermore, must be "highly deferential" and "indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance."Strickland, supra, at 690, 104 S.Ct. at 2065.
As noted earlier, there may have been tactical reasons for defense counsel's failure to object to Officer Meece's testimony. By allowing Office Meece to testify that Norton's injuries appeared to have been caused by a blunt instrument, the defense was then able to exploit on cross-examination the fact that no blunt instrument was ever found by the police in the abandoned house. Under any scenario, however, we cannot say that the outcome of the trial would probably have been different without Officer Meece's testimony on the blunt instrument and lack of blood spatter. The primary evidence against Turner would have still remained — the fact that he was seen shepherding Norton in a highly vulnerable state of extreme intoxication; that he was later spotted scrambling to leave a building in which Norton was found unconscious, bleeding, and robbed; and that he then lied to the arresting officers about Norton's whereabouts, telling the officers that Norton had taken a bus.
We find no merit, therefore, in Turner's sixth and final assignment of error.
Accordingly, the judgment of the trial court is affirmed.
DOAN, P.J., and PAINTER, J., concur.
The Court has placed of record its own entry in this case on the date of the release of this Opinion.