OPINION
The present appeal arises from the decision of the Harrison County Common Pleas Court sentencing Danny Jenkins on convictions of two counts of aggravated murder, two counts of aggravated robbery and gun specifications which accompanied each of the four crimes. For the reasons set forth below, the decision of the trial court is affirmed in part, reversed in part and this matter is remanded to the trial court for the sole purpose of re-sentencing appellant in accordance with the requirements of R.C. 2929.19.
 I. FACTS
The record reflects that on October 31, 1997, Duane and William Lockard were murdered while hunting in Harrison County, Ohio. Both individuals died as a result of a single shotgun blast to the back which was sustained while they were in their tree stands hunting for deer. Said stands were determined to be approximately one half of a mile apart from one another. Although the time of death was determined to be the afternoon of October 31, 1997, the bodies were not discovered until November 2, 1997. When the hunters did not appear as expected on the evening of November 1, 1997, search parties were formed to comb the area in an attempt to locate them.
As a result of these events, an investigation began in order to collect evidence and testimony regarding potential suspects. Following numerous interviews with various individuals, the state eventually felt that it had collected enough evidence to implicate Danny Jenkins ("appellant") who was formally arrested on November 5, 1997. Appellant was subsequently indicted by a special session of the Harrison County Grand Jury on November 18, 1997 on two counts of aggravated murder in violation of R.C.2903.01(B) and two counts of aggravated robbery in violation of R.C. 2911.01(A)(3). Each of said charges was accompanied by a gun specification as provided in R.C. 2941.145.
At appellant's arraignment on November 21, 1997, pleas of not guilty were entered on all charges. Appellant proceeded to file a number of motions regarding the pending action amongst which was a motion to suppress all statements made to law enforcement officials. The basis for said motion was that all statements provided by appellant were allegedly obtained in violation of theFifth, Sixth and Fourteenth Amendments of the U.S. Constitution. Following a hearing on the matter on March 11, 1998, the trial court granted appellant's request in part and denied it in part. Specifically, the trial court ordered that the portion of appellant's November 5, 1997 statement which followed his request for counsel had to be suppressed. All other portions of appellant's November 5, 1997 statement, as well as remarks made on November 8, 1997, were deemed admissible.
Upon completing all pre-trial matters, the case proceeded to a jury trial on April 13, 1998. At the conclusion of the states presentation, appellant moved for a dismissal of the charges on the grounds that the state had failed to meet its burden of proof as related to all elements of the charged offenses. Said motion was overruled by the trial court as it believed sufficient evidence had been produced so as to permit the matter to be submitted to the trier of fact. At this point, appellant rested prior to submitting any evidence or testimony. After being instructed on the applicable law, the jury retired in order to deliberate. Almost immediately after beginning deliberations, the jury was called back before the trial judge so that a correction could be made in regards to one of the verdict forms. The jury briefly deliberated thereafter and ultimately returned guilty verdicts on both aggravated murder charges, both aggravated robbery charges and all gun specifications. Pursuant to the trial court's April 17, 1998 judgment entry, appellant was sentenced to the following terms of incarceration, all of which were ordered to run consecutively: 20 years to life on each count of aggravated murder, 10 years on each count of aggravated robbery and three years on each gun specification.
It is from this decision that appellant filed a timely notice of appeal on April 23, 1998. Appellant raises seven assignments of error on appeal.
 II. ASSIGNMENT OF ERROR NUMBER ONE
Appellant's first assignment of error reads:
 "THE COURT SHOULD HAVE GRANTED THE APPELLANT'S PRETRIAL MOTION TO SUPPRESS THE APPELLANT'S ENTIRE STATEMENT AS THE APPELLANT WAS A SUSPECT, IN CUSTODY AT THE TIME OF THE INTERROGATION, AND WAS NOT GIVEN MIRANDA WARNINGS IN VIOLATION OF HIS SIXTH AMENDMENT RIGHTS."
Under appellant's first assignment of error, attacks are made against both appellant's November 5, 1997 statement to Bureau of Criminal Investigation ("BCI") agents and his November 8, 1997 statement made to Sheriff Miller of Harrison County and Sheriff Abdalla of Jefferson County. In regards to the first statement, appellant alleges that BCI agents requested that he come to the Harrison County Sheriff's office in order to answer some questions regarding the Lockard murders. Appellant agreed and subsequently arrived at the Sheriff's office on November 5, 1997. At that time, appellant contends that he was formally a suspect in the murders and was subjected to custodial interrogation without the benefit of being advised of the Miranda rights. Appellant further asserts that if his Miranda rights were violated, his entire statement should be suppressed rather than merely that portion which occurred after he requested counsel.
As to his November 8, 1997 statement, appellant states that he was incarcerated in the Tuscarawas County Jail waiting to be formally charged. Furthermore, it is uncontested that at that time appellant already had been appointed counsel. Although appellant never made a request to speak with Sheriffs Miller or Abdalla, it is alleged that the two appeared at the jail and again subjected appellant to questioning. At no time was counsel for appellant notified that such questioning was going to occur. In that appellant had previously requested counsel and such was not present during the unsolicited questioning, appellant argues that any testimony surrounding his statements on November 8, 1997 should have been suppressed.
The state ("appellee") responds to appellant's first argument by indicating that appellant was not in custody on November 5, 1997 when the questioning took place and, as such, there was no need to advise appellant of the Miranda rights. Appellee states that appellant voluntarily drove from Akron to Cadiz in order to give background information regarding the victims. Additionally, the questioning took place in an open office in which other individuals freely entered and exited during the course of the interview. Based upon these circumstances, in addition to the fact that appellant was not the prime suspect, leads appellee to the conclusion that appellant could not be viewed as being under arrest or having had his freedom restrained. Therefore, the questioning was proper and the trial court correctly overruled that portion of appellant's motion to suppress.
As to appellant's second argument regarding an "in custody" statement, appellee contends that it did not initiate any questioning of appellant on November 8, 1997. On the contrary, appellee indicates that Sheriffs Miller and Abdalla merely visited appellant at the jail in order to inform him of the charges which were being brought against him. After doing so, it is alleged that appellant began asking questions and volunteering information. In light of the fact that appellant had obtained counsel and had previously invoked his Miranda rights, Sheriff Abdalla immediately restated the Miranda warnings to appellant. Despite these precautions, appellant waived his rights and continued to converse with Sheriffs Miller and Abdalla. Based on these circumstances, appellee is of the position that the Sheriffs were permitted to question appellant as he initiated the actual discussion of the case and he waived his Miranda rights a second time.
 A. STANDARD OF REVIEW
This court has previously concluded that our standard of review with respect to a motion to suppress is limited to determining whether the trial court's findings are supported by competent, credible evidence. State v. Winand (1996), 116 Ohio App.3d 286,288 citing Tallmadge v. McCoy (1994), 96 Ohio App.3d 604, 608. Such a standard of review is appropriate as "[i]n a hearing on a motion to suppress evidence, the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." State v.Hopfer (1996), 112 Ohio App.3d 521, 548 quoting State v. Venham
(1994), 96 Ohio App.3d 649, 653. However, once we have accepted those facts as true, we must independently determine as a matter of law whether the trial court met the applicable legal standard.State v. Williams (1993), 86 Ohio App.3d 37, 41.
 B. APPLICABLE LAW
As this court previously recognized in State v. Latham (July 12, 1999), Belmont App. No. 96-BA-30, unreported, the reading of the Miranda rights as a procedural safeguard against self-incrimination arises whenever an individual is subjected to custodial interrogation by a law enforcement officer. Id. at 5 citing Miranda v. Arizona (1966), 384 U.S. 436, 478. The concept of "custodial interrogation" has been equated to those instances in which "questioning [has been] initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."Thompson v. Keohane (1995), 516 U.S. 99, 107 quoting Miranda at 444. The focus of the custodial portion of the custodial interrogation analysis is on whether a formal arrest has in fact occurred or a restraint on one's freedom of movement has occurred to the degree associated with a formal arrest. California v.Beheler (1983), 463 U.S. 1121, 1125. Furthermore, the determination of whether a custodial interrogation has occurred requires an inquiry into "how a reasonable man in the suspect's position would have understood his situation." State v. Biros
(1997), 78 Ohio St.3d 426, 440 quoting Berkemer v. McCarty (1984)468 U.S. 420, 442. A suspect's subjective feelings are not relevant in such an inquiry. Stansbury v. California (1994),511 U.S. 318.
Despite appellant's repeated reference to his belief that he was a suspect prior to and during questioning, such information is wholly irrelevant to the determination of whether or not a reading of the Miranda rights was warranted. The U.S. Supreme Court has held that a law enforcement officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment of whether the person is in custody. Id. at 319. The sole focus is to be the objective circumstances of the interrogation and not the subjective views harbored by the interrogating officers or the person being questioned. Id. at 323.
As appellant indicates in his brief, once a request has been made for counsel all questioning should cease and law enforcement officers should not seek to reinitiate questioning absent the presence of counsel for the defendant. Edwards v. Arizona (1981)451 U.S. 477, 484. However, under limited exceptions to this general rule, law enforcement officers may nonetheless again question an individual after the request for counsel has been made. For instance, if the accused himself initiates further communication, exchanges or conversation with the police then it is not necessary for counsel to be present during such occurrences. State v. Raglin (1998), 83 Ohio St.3d 253, 262
citing Edwards at 484-485. As an additional safeguard, a reviewing court should analyze the facts and circumstances surrounding each case to determine whether the accused voluntarily, knowingly and intelligently relinquished or abandoned his known right to counsel after having previously requested such. Edwards at 482.
The opinion espoused by the U.S. Supreme Court in Edwards has been subjected to further explanation and clarification. The court has emphasized that the purpose of the procedures set forth in its prior decision is to ensure that any statement made in a subsequent interrogation is not the result of coercive police pressure. Minnick v. Mississippi (1990), 498 U.S. 146, 150 citingMichigan v. Harvey (1990), 494 U.S. 344, 350. Similarly, the court indicated that its desire was to prevent police from badgering a defendant into waiving his previously assertedMiranda rights. Id. The focus is to be on whether law enforcement officials were responsible for initiating the questioning of a defendant once the right to counsel had been exercised. Id. These later decisions address the concerns raised in the concurring opinion in Edwards which was drafted by Justice Powell and joined by Justice Rehnquist. In the concurring opinion, it was acknowledged that "communications between police and a suspect in custody are commonplace." Edwards, supra at 490. As such, police should not be viewed as impermissibly initiating renewed interrogation of a suspect merely by engaging in routine conversations regarding unrelated matters. Id.
 C. ANALYSTS
In regards to appellant's challenge to his statement on November 5, 1997, a review of the record necessitates a conclusion that he was not in custody prior to the actual reading of his Miranda rights. Therefore, the trial court did not err in overruling that portion of appellant's motion to suppress related to his statements made prior to his formal request for counsel.
As appellee properly points out, BCI made arrangements over the telephone for appellant to come to the Harrison County Sheriff's Office in order to give a statement regarding the Lockard murders. Appellant voluntarily agreed to drive from Akron to Cadiz in order to oblige the law enforcement officers' request. Upon arriving at the Sheriff's office, appellant was neither placed under arrest nor was he restrained in his freedom of movement to the degree of a formal arrest. Beheler, supra. The record reveals that the questioning of appellant took place in the Captain's office with the door open at all times. This office was described as a large office on the first floor of the building. Other individuals freely entered and exited the office during the period of questioning which would support a finding that the questioning process was quite informal. The BCI agents which conducted the questioning indicated that appellant was offered the comforts of a beverage, cigarettes and the use of the bathroom during the course of the interview. Furthermore, the agents testified that up until the time that appellant became a prime suspect and was Mirandized he was free to leave if he so desired.
Circumstances such as these provided the court with competent, credible evidence in support of its conclusion that the majority of appellant's November 5, 1997 statement should not be suppressed. There is no indication that a reasonable person in appellant's position would have believed that he was in custody or under arrest and thus not able to leave the Sheriff's office. See Biros, supra. Appellant had originally been called down on November 5, 1997 solely to provide background information regarding the victims as he was known to have been friends with them for a number of years. Only when the interviewing officers observed inconsistencies between appellant's statements and those of other witnesses was he considered a prime suspect who was no longer free to leave and therefore was Mirandized. Particularly, another individual who was being questioned in a different part of the Sheriff's office was able to positively identify appellant's vehicle as being present in the area of the murders on October 31, 1997. Since appellant insisted he was in Akron on the day of the murders, the interviewing officers determined that at that point appellant should be Mirandized so as more pointed questions could be asked. Prior to this point in time, a reading of the Miranda rights was not warranted.
Further support is gained for the trial court's decision by comparing the analogous facts present in State v. Biros (1997),78 Ohio St.3d 426 to those in the case at bar. In Biros the defendant made a similar argument that he was in custody at the time of questioning and therefore his statement must be suppressed due to the failure to advise him of the Miranda
rights. The facts of the case reveal that law enforcement officers picked up the defendant and took him to the police station in order to question him regarding an acquaintance who was missing. Upon arriving at the police station, appellant was interviewed in an interrogation room by a number of police officers. During the course of the interview, the door remained open. The defendant was never compelled to respond to questions posed by the interrogation officers. The nature of the questions eventually turned to requesting an explanation for inconsistencies in the defendant's answers in an attempt to resolve the matter. The only distinguishing factor from the present case is that the defendant was expressly advised that he was not under arrest and was free to leave at any time.
In concluding that the defendant was not in custody and thus a reading of the Miranda rights was not warranted, the Ohio Supreme Court indicated that there was "absolutely no evidence to indicate that appellant was under arrest or that police imposed any restraint in his freedom of movement." Id. at 442. The court further held that merely because the questioning takes place at the police station or because the individual being questioned is a suspect does not automatically give rise to a finding that the individual is in custody for Miranda purposes. Id. at 440. The primary consideration must be how a reasonable individual in the defendant's position would have understood his or her position.Id. citing Berkemer, supra.
As was the case in Biros, the present case does not present this court with evidence that a reasonable person in the same situation would feel that he was under arrest or had his freedom of movement impeded. Despite the fact that appellant was not expressly advised that he was not under arrest, the circumstances surrounding the questioning are not supportive of a finding that restraint equivalent to an arrest occurred. On the contrary, up until the time that the Miranda rights were actually read and the questions became more pointed in nature, the environment surrounding the questioning process was more consistent with an informal interview for the purposes of obtaining background information on the victims and their personal habits. Normally one who is under arrest or who is having his freedom restrained does not voluntarily drive long distances in order to answer questions in a Captain's office. Similarly, those circumstances such as handcuffing the individual; requiring that the door to the interview room be closed or locked; or restricting access of others to the individual being questioned, which would support a finding of an arrest or a restraint of freedom are not present in the case at bar. Therefore, it cannot be held that appellant was in custody and therefore entitled to a reading of the Miranda
warnings.
As to appellant's contention that he should have been advised of the Miranda rights immediately upon arriving at the Sheriff's office due to his belief that he was already a suspect, such need not be addressed herein. As previously discussed, it is irrelevant as to whether the interviewing officers regard an individual as a suspect at the time of questioning. Stansbury,supra. The focus of a court which is considering whether an individual should have been Mirandized only needs to be on whether a custodial interrogation took place. Id. Having determined that appellant was not in custody at the time he was interviewed, this court need not proceed any further in its analysis.
As to appellant's argument regarding his statements on November 8, 1997, this position is also held to lack merit. Both Sheriff Miller and Sheriff Abdalla testified during the hearing on the motion to suppress that the sole purpose for approaching appellant while he was in the Tuscarawas County Jail was to advise him that he was to be formally charged. Such contact between law enforcement and a defendant in custody is precisely that type of communication referenced by Justice Powell and Justice Rehnquist in their concurring opinion in Edwards, supra. While the concurring opinion itself is by no means binding authority, it is nonetheless instructive in light of the reasoning set forth in cases following the Edwards decision. As the U.S. Supreme Court indicated in both Minnick and Harvey, supra, the purpose of the doctrine espoused in Edwards was merely to prevent law enforcement from continuously badgering a defendant until he gave in and waived the right to counsel he had previously asserted. While such a policy is laudable, it has not and should not be expanded in such a way to prevent any type of communication between the police and a defendant who is in custody. The key question is determining who initiated the actual communication which was materially related to one's Miranda
rights.
As previously discussed, Sheriffs Miller and Abdalla were present at appellant's cell for valid reasons unrelated to interrogation. At the point appellant began to voluntarily state information regarding the offenses, Sheriff Abdalla did the appropriate thing and immediately advised appellant of theMiranda warnings. Sheriff Abdalla testified at the hearing on the motion to suppress that appellant indicated that he understood each of these warnings but desired to continue his discussion in regards to the case. Under these circumstances, any responses to questions posed after a valid waiver occurred need not be suppressed. Said responses clearly were not the result of policeinitiated interrogation as appellant initiated the discussion of pertinent facts surrounding the case. The focus of this type of analysis must not be on who initiated the contact, but rather who initiated the discussion. If this court were to find otherwise, it would essentially be holding that either 1) law enforcement officers could not have contact with an incarcerated defendant in the absence of counsel if in fact the individual had previously invoked such right, or 2) if contact were made with the incarcerated defendant no questions could be posed to the individual even if he were to initiate conversation regarding the charged offenses. In essence, even if the individual attempted to make a knowing, intelligent and voluntary waiver of his previously invoked rights, such a waiver could never be effective so as to permit questioning absent the presence of counsel. This type of result clearly was not what was expected when the U.S. Supreme Court decided Edwards and its progeny.
This conclusion is further supported by looking to the facts which lead to the decision in the Edwards case. In that case, the defendant was arrested on charges of first degree murder, robbery and burglary. Upon being arrested, the defendant was transported to the police station and Mirandized. After discussing the matter with law enforcement officers for a period of time, the defendant requested counsel and the questioning ceased. However, the very next morning detectives visited appellant in his cell and advised him that they wanted to talk to him some more. Defendant was again Mirandized and questioning continued. During this interview, the defendant implicated himself as to the charged offenses. These facts are much more cut and dry than those in the case at bar. Law enforcement officials in Edwards clearly initiated questioning in hopes of obtaining a confession even after appellant had asserted his right to counsel. The sole reason defendant was visited in jail was in order to try and break his will and obtain damaging statements. This type of malevolent purpose clearly was not exhibited by the law enforcement officers in the present case.
Hence, it is held that the trial court was presented with competent, credible evidence which justified its decision regarding appellant's statements to law enforcement officials on November 5 and November 8, 1997. As such, appellant's first assignment of error is overruled.
 III. ASSIGNMENT OF ERROR NUMBER TWO
Appellant's second assignment of error reads:
 "THE TRIAL COURT FAILED TO COMPLY WITH OHIO REVISED CODE 2929.19(B)(3)(B),(C) AND (E) WHICH REQUIRES NOTIFICATIONS TO THE DEFENDANT AT SENTENCING OF BAD TIME AND POST RELEASE CONTROL."
Under appellant's second assignment of error, it is argued that the trial court failed to comply with the sentencing guidelines as set forth in R.C. 2929.19. In particular, appellant argues that he was not advised of the potential of "bad time" being added to his sentence as provided in R.C. 2929.19(B)(3)(b). Additionally, appellant asserts that the trial court did not advise him regarding post-release control pursuant to R.C.2929.19 (B)(3)(c) and (e)
The disposition of this assignment of error is governed by R.C.2929.19(B)(3) which provides in relevant part as follows:
 "(3) Subject to division (B)(4) of this section, if the sentencing court determines at the sentencing hearing that a prison term is necessary or required, the court shall do all of the following:
* * *
 (b) Notify the offender that the parole board may extend the stated prison term if the offender commits any criminal offense under the laws of this state or the United States while serving the prison term, that the extension will be done administratively as part of the offender's sentence in accordance with section 2967.11 of the Revised Code and may be for thirty, sixty, or ninety days for each violation, that all extensions of any stated prison term for all violations during the course of the term may not exceed one-half of the term's duration, and that the sentence so imposed automatically includes any extension of the stated prison term by the parole board;
 (c) Subject to division (B)(4) of this section, if the offender is being sentenced for a felony of the first degree * * * notify the offender that a period of post-release control pursuant to section 2967.28 of the Revised Code will be imposed following the offender's release from prison;
* * *
 (e) Notify the offender that, if a period of post-release control is imposed following the offender's release from prison, as described in division (B)(3)(c) or (d) of this section, and if the offender violates a post-release control sanction imposed as a component of the post-release control including the mandatory condition described in division (A) of section 2967.12.1 [2967.121] of the Revised Code, all of the following apply: * * *." (Emphasis added).
By indicating that the sentencing court "shall do all of the following," the legislature clearly placed a mandatory duty upon the trial court rather than granting it discretion.
A review of the record in the case at bar reveals that the trial court completely ignored the above mentioned mandates. In imposing the sentence upon appellant, the trial court merely recited the offenses to which appellant was convicted, indicated the terms of incarceration which were being imposed and advised appellant of his right to appeal. Absolutely no mention of "bad time" or post-release control appears in either the transcript or the trial judge's sentencing entry. As a result, the sentencing court clearly erred by failing to comply with sentencing requirements as set forth under R.C. 2929.19(B)(3).
Both the Third and Eighth District Courts of Appeals were faced with identical situations and reached identical conclusions inState v. Lazenby (Nov. 13, 1998), Union App. No. 14-98-39, unreported and State v. Davis (June 18, 1998), Cuyahoga App. No. 72820, unreported, respectively. Accordingly, we find this assignment of error to be well-taken. Appellant's sentence must be reversed and this matter is remanded for the sole purpose of re-sentencing in accordance with the requirements set forth in R.C. 2929.19. However, we emphasize that said reversal and remand are only for the purpose of compliance with the foregoing statute and in no way affects the validity of the underlying conviction.
 IV. ASSIGNMENT OF ERROR NUMBER THREE
Appellant's third assignment of error reads:
 "THE ASSISTANT PROSECUTING ATTORNEY COMMITTED MISCONDUCT BY COMMENTING UPON THE DEFENDANT'S FAILURE TO TESTIFY ON HIS OWN BEHALF AT TRIAL AND THE TRIAL COURT COMMITTED ERROR BY REFUSING TO GRANT THE DEFENDANT'S MOTION FOR A MISTRIAL."
Appellant next alleges that a mistrial should have been granted due to a comment made by the prosecutor during closing arguments. During appellee's closing argument, the prosecutor stated "Danny offers no explanation of why Bill Lockard's binoculars ended up in his trunk." (Tr. at 697). Appellant construes this comment as an inappropriate reference to his choice to remain silent and not testify at the trial. Due to the fact that a curative instruction was never issued to the jury by the trial court, appellant asserts that he was denied a fair trial. Therefore, it is argued that a mistrial should have been granted when requested by appellant at the conclusion of appellee's closing argument.
Appellee responds to this argument by indicating that appellant misconstrues this statement. It is argued that by taking the statement out of context appellant is improperly attempting to establish that appellee was commenting on the failure to testify. However, appellee asserts that this comment during closing argument related solely to an omission in appellant's exculpatory statement to police and thus was properly permitted.
 A. APPLICABLE LAW
On numerous occasions this court has had the opportunity to address alleged instances of prosecutorial misconduct. The two pronged test for prosecutorial misconduct is: (1) whether remarks were made by the prosecutor which were improper; and if so, (2) whether those remarks prejudicially affected the rights of the accused. State v. Scott (June 30, 1998), Mahoning App. No. 94-CA-188, unreported citing State v. Lott (1990), 51 Ohio St.3d 160. Furthermore, "the touchstone of due-process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." State v.Edighoffer (Dec. 16, 1998), Mahoning App. Nos. 96-CA-161 and 96-CA-162, unreported quoting State v. Hill (1996), 75 Ohio St.3d 195,203. As such, not every intemperate comment made by a prosecutor can be the basis for a reversal. State v. Bey (1999),85 Ohio St.3d 487, 494. As to the second prong of the test as outlined in Scott, no prejudice will be found when the state of the evidence is such that it is certain beyond a reasonable doubt that the defendant would have been found guilty even if the remark had not been made. State v. Twyford (Sept. 25, 1998), Jefferson App. No. 93-J-13, unreported citing State v. Smith
(1984), 14 Ohio St.3d 13, 15. In making such a determination, the effect of the alleged misconduct must be judged in the context of the entire trial. State v. Poole (Dec. 24, 1996), Mahoning App. No. 94-CA-205, unreported citing State v. Keenan (1993), 66 Ohio St.3d 402,410.
 B. ANALYSIS
When the prosecutor's statement is examined in the context in which it was made, it is evident that appellant is unable to prove any instance of prosecutorial misconduct. Furthermore, in that our analysis reveals that the comment cannot even be construed as improper, this court need not address the second portion of the test as outlined in Scott and Lott, supra.
While appellant argues that the prosecutor improperly commented on his failure to testify at trial, appellee provides a more appropriate explanation. The context of the statement made during closing argument reveals that the prosecutor merely commented on an omission in appellant's exculpatory statement which was made prior to trial. The portion of the prosecutor's closing argument which preceded the comment in question states as follows:
 "Danny Jenkins tells you a story that `hey, Duane Lockard gave me those binoculars three months ago' but you heard testimony from Matt the grandson and you heard testimony from Jean his wife that they had used those binoculars one week prior to the murders and two weeks prior to the murders respectively. Danny offers no explanation of why Bill Lockard's binoculars ended up in his trunk." (Tr. at 697)
A similar situation was recently addressed by the First District Court of Appeals in State v. Johnson (May 1, 1998), Hamilton App. No. C-970180, unreported. In Johnson the defendant also argued that the prosecutor impermissibly commented about the failure to take the stand. This allegation was based upon the following statement by the prosecutor during closing argument: "Ladies and gentlemen, if somebody else did, why didn't the defendant tell us about that in his statement." Id. at 1. However, in relying on Ohio Supreme Court authority the court of appeals determined that such a statement had no bearing on appellant's failure to take the stand. Id. at 2. On the contrary, the prosecutor's statement was viewed by the court as addressing only appellant's failure to explain certain vital facts when he gave his statement to police after his arrest. Id.
In arriving at this decision, the court determined that when a defendant makes an exculpatory statement to police he cannot be said to have relied upon the Miranda warnings given at a post-arrest police interrogation. Id. citing State v. Gillard
(1988), 40 Ohio St.3d 226, 231. Therefore, it is appropriate for a prosecutor to comment upon any omissions which are contained within the statement. Id.
The Fourth District Court of Appeals made the same conclusion in City of Chillicothe v. Smith (Jan. 27, 1993), Ross App. No. 1836, unreported. In this decision the court held that a defendant who chooses to voluntarily speak with law enforcement officers cannot be found to have relied upon the implied promise in the Miranda warnings that his silence will not be used against him. Id. at 4 citing Gillard, supra. The court further held that when a defendant voluntarily offers information to police, "his toying with the authorities by allegedly telling only part of his story is certainly not protected by Miranda * * *." Id.
In the case at bar, we are presented with the same circumstances as presented in both Johnson and Smith. At trial, Sheriffs Miller and Abdalla testified regarding statements made by appellant on November 8, 1997. Sheriff Miller indicated that appellant volunteered information regarding one pair of binoculars being in his car as Duane Lockard had let him borrow them approximately three months prior to his death. Despite this statement, two pairs of binoculars were found in the trunk of appellant's car. Sheriff Abdalla provided additional support for this statement when he indicated that appellant had failed to address the existence of two pairs of binoculars.
Based upon this testimony in conjunction with the context in which the prosecutor made the comment in question, it is clear that the statement did not relate to appellant's failure to testify at trial. Rather, the prosecutor was bringing to light the fact that an omission existed in appellant's post-arrest exculpatory statement. In that appellant voluntarily chose to make such statements, it cannot be held that he was exercising his right to be silent and thus be free from incriminating himself. Gillard, supra. Once appellant decided to converse with law enforcement officials in an attempt to clear himself, appellee was free to take issue with any omission or discrepancy which tended to undermine the reliability of the exculpatory remark. Id. A prosecutor is not limited to referring only to those parts of a defendant's statement which are advantageous.Id. citing United States v. Goldman (C.A. 1, 1977), 563 F.2d 501,503.
Since the comment made by the prosecutor during closing argument was a proper reference to an omission in appellant's post-arrest statement, we cannot hold that the trial court erred in overruling the motion for a mistrial. No instance of prosecutorial misconduct has been established and thus, appellant's third assignment of error is held to lack merit.
 V. ASSIGNMENT OF ERROR NUMBER FOUR
Appellant's fourth assignment of error reads:
 "THE COURT ERRED BY ALLOWING THE STATE TO INTRODUCE EVIDENCE OF THE DEFENDANT'S CHARACTER AT TRIAL BEFORE THE DEFENDANT PUT HIS CHARACTER AT ISSUE."
Appellant next argues that the trial court erred when it impermissibly allowed the introduction of character evidence. Particularly, appellant asserts that it was improper to permit Internal Revenue Agent Phillip O'Koneck to testify in regards to his opinion that appellant needed money. It is appellant's belief that this testimony was not relevant to the murders or the robberies and thus should have been excluded. Furthermore, it is argued that this testimony was introduced by appellee for the sole purpose of impugning appellant's character. Since the prejudicial effect of this testimony was believed to far outweigh any probative value and since it was believed to be improper character evidence, appellant argues that Agent O'Koneck's testimony should have been excluded in its entirety.
 A. STANDARD OF REVIEW
In reviewing a trial court's decision to admit or exclude evidence, an appellate court must limit its review to whether the trial court abused its discretion. State v. Finnerty (1989),45 Ohio St.3d 104, 107. An abuse of discretion "connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v.Adams (1980), 62 Ohio St.2d 151, 157. In light of this standard of review, a reviewing court should not substitute its judgment for that of the trial court. State v. Jenkins (1984), 15 Ohio St.3d 164,222.
 B. APPLICABLE LAW
The admissibility of character evidence is governed by Evid.R. 404 which states in relevant part:
"(A) Character evidence generally
 Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion,
* * *
(B) Other crimes, wrongs or acts
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
The purpose of Evid.R. 404(B) was analyzed by the Ohio Supreme Court when it decided State v. Smith (1990), 49 Ohio St.3d 137. In its opinion, the court stated that Evid.R. 404(B) was essentially an extension of Evid.R. 404(A) which was intended to preclude prejudicial attacks on a defendant's character. Id. at 140. "Generally, extrinsic acts may not be used to prove the inference that the accused acted in conformity with his other acts or that he has a propensity to act in such a manner." Id.
Further insight into the admissibility of evidence is gained from Evid.R. 402 and Evid.R. 403. Evid.R. 402 provides the general rule that all evidence which is determined to be relevant to the proceedings is admissible. However, an exclusion of relevant evidence is provided under Evid.R. 403(A) which states that even relevant evidence may be excluded if it is determined that its probative value is substantially outweighed by the danger of unfair prejudice.
 C. ANALYSIS
While appellant argues both that the testimony was inadmissible character evidence and that its prejudicial effect outweighed its probative value, each of these arguments lacks merit. As to appellant's argument that Agent O'Koneck's testimony constituted impermissible character evidence, such is clearly in error as the testimony went solely to motive rather than character. During the course of Agent O'Koneck's testimony, which consisted of only three pages in the transcript, the majority of the questioning concerned the agent's background, education, employment, etc. The remainder of the time was spent briefly discussing Agent O'Koneck's prior contact with appellant. Agent O'Koneck testified that he had met with appellant in Akron and during that time formed an impression of appellant's financial situation. In the agent's opinion, appellant "needed money". (Tr. at 654)
The general exclusion provided under Evid.R. 404(A) as related to character evidence expressly relates to that evidence which is introduced for the purpose of proving that an individual acted in conformity with past behavior. Smith, supra. Such was clearly not the purpose for offering testimony from Agent O'Koneck. Appellee did not seek to have the agent testify as to prior wrongful conduct which would tend to prove appellant's guilt in the case at bar. On the contrary, this testimony goes directly to the exception of motive as provided under Evid.R. 404(B). The fact that appellant needed money assists appellee in establishing appellant's motive for robbing the victims.
The Ohio Supreme Court addressed a similar concern when it decided State v. Henness (1997), 79 Ohio St.3d 53. In that case, testimony was offered regarding appellant's drug use on and after the day of the murder and robbery. The defendant argued that the trial court should not have permitted the admission of such testimony as it was the type of character evidence which was barred by Evid.R. 404(A). However, the Ohio Supreme Court held that the testimony was relevant for non-character purposes and therefore was admissible. Id. at 61. In the court's opinion, the defendant's "drug addiction and use shows his need for money and, hence, his motive to steal and kill." Id. Based upon this reasoning under analogous circumstances, we find that Agent O'Koneck's testimony was relevant and admissible as it went to motive rather than character.
Appellant's argument that the testimony's prejudicial effect outweighed its probative value must similarly fail. The crux of this portion of appellant's argument is that Agent O'Koneck testified that he worked for the Criminal Division of the Internal Revenue Service. The reference to "criminal" during the agent's testimony regarding his employment is argued to infer to the jury that appellant was involved in some unlawful activity which subjected him to the Agency's scrutiny. However, at best appellant is able to make the unsubstantiated assertion that the jury could make such an inference. At no point during the questioning did Agent O'Koneck expressly state that appellant had committed any illegal activity. As previously explained, the testimony was solely related to the agent's personal belief that appellant needed money.
This testimony is clearly relevant since it probatively relates to the issue of motive. Furthermore, as Evid.R. 403(A) indicates, the prejudicial effect must "substantially" outweigh the probative value. When examined in its entirety, it cannot be held that any prejudice substantially outweighed the testimony's probative value. The testimony which was provided was quite minimal and focused on the issue of motive rather than defendant's character. The mere reference to the Criminal Division cannot be held to outweigh the value the testimony provides as a whole. Therefore, the trial court cannot be viewed as having abused its discretion when it permitted Agent O'Koneck to testify. Appellant's fourth assignment of error is overruled.
 VI. ASSIGNMENT OF ERROR NUMBER FIVE
Appellant's fifth assignment of error reads:
 "THE COURT SHOULD NOT HAVE PERMITTED TESTIMONY REGARDING VIDEO SURVEILLANCE TAPES THAT WERE NOT PROVIDED OR DISCLOSED TO THE DEFENDANT IN DISCOVERY."
Under appellant's fifth assignment of error it is alleged that appellee failed to comply with Crim.R. 16 as related to the disclosure of favorable evidence. During the direct examination of two BCI agents, appellee elicited testimony regarding a video surveillance tape from a store in Akron where appellant claimed he had visited on the day of the murders. However, appellee never produced the tapes pursuant to discovery for appellant's review. This failure of production is equated by appellant to a denial of his right to establish an alibi.
In support of this position, appellant relies upon Brady v.Maryland (1963), 373 U.S. 83 for the proposition that the suppression of favorable evidence by the prosecution violates due process when said evidence is material either to guilt or punishment. While appellant makes a correct recitation of the law as set forth in Brady, he makes a number of factual misrepresentations in his brief in regards to this assignment of error which are critical to a proper resolution of this claim. First, appellant asserts that appellee introduced testimony regarding the video surveillance tape which allegedly depicted appellant at a convenience store in Akron. However, the record reflects that both Agents Kopfer and Mroczkowski of BCI testified that appellant did not appear in the video surveillance tape. (Tr. at 562 and 594 respectively). Second, appellant states in his brief that Agent Mroczkowski testified that appellant was seen in liquor stores and a cigarette store. A review of the agent's testimony at trial reveals that the exact opposite conclusion is true. Finally, appellant makes the allegation that appellee failed to turn over evidence which was favorable to his position, namely the tapes. However, as will later be discussed in more detail, the tapes could not be viewed as being favorable in nature.
 A. APPLICABLE LAW
Crim.R. 16(B) controls when determining what evidence the prosecution must turn over to a defendant during discovery. While this section of the rule contains seven subsections, only the following two are relevant to the present case:
"(B) Disclosure of evidence by the prosecuting attorney
(1) Information subject to disclosure.
* * *
 (c) Documents and tangible objects. Upon motion of the defendant the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, available to or within the possession, custody or control of the state, and which are material to the preparation of his defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant.
* * *
 (f) Disclosure of evidence favorable to defendant. Upon motion of the defendant before trial the court shall order the prosecuting attorney to disclose to counsel for the defendant all evidence, known or which may become known to the prosecuting attorney, favorable to the defendant and material either to guilt or punishment. * * *." (Emphasis added).
A line of U.S. Supreme Court cases starting with Brady
addresses when evidence must be turned over by the state as well as when the failure to do so equates to a denial of due process. An analysis of these cases is helpful to determining exactly what Crim.R. 16(B) requires.
Pursuant to the reasoning in Brady, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. In analyzing this language the Ohio Supreme Court realized that the same language, that being "favorable to the defendant [accused] and material either to guilt or punishment," appeared in both Crim.R. 16(B) andBrady, supra. State v. Keene (1998), 81 Ohio St.3d 646, 650. As a result, the Ohio Supreme Court concluded that the language as used in the Criminal Rules would be afforded the same meaning as it was given in Brady and its progeny. Id.
The touchstone of materiality as set forth in Brady is whether there is a reasonable probability that the jury would have arrived at a different result if the suppressed evidence had been admitted. Kyles v. Whitley (1995), 514 U.S. 419, 434. A reasonable probability of a different result can be shown if the suppression of the evidence by the prosecution undermined the confidence in the outcome of the trial. United States v. Bagley
(1985), 473 U.S. 667, 678. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial * * *." Kyles, supra.
The determination of whether evidence is "favorable" to the defendant's position and thus subject to disclosure is normally left to the prosecution rather than the trial judge. State v.Lawson (1992), 64 Ohio St.3d 336, 343 citing Pennsylvania v.Ritchie (1987), 480 U.S. 39, 59. This is especially the case when a defendant merely makes a general request for all exculpatory evidence. Id. Once the prosecution has reviewed its file and provided all evidence which it deems is favorable to defendant, said decision is final absent a showing by the defendant that the prosecution has failed to turn over particular items which are exculpatory in nature. Id. The court further expanded on this principle when it held that "[t]he mere possibility that an item of undisclosed information might have helped * * * does not establish `materiality' in the constitutional sense." Lawson,supra quoting United States v. Agurs (1976), 427 U.S. 97,109-110.
 B. ANALYSIS
In the case at bar, appellant has failed to establish either that the video surveillance tape was favorable to his position or that it was material to guilt or punishment. Despite appellant's contention to the contrary, testimony from both Agents Kopfer and Mroczkowski reveals that the video surveillance tape which was retrieved from an Akron cigarette store failed to depict appellant in the store on the day of the murders. This fact alone would serve to hinder rather than assist appellant in establishing an alibi on the day in question. Therefore, the information clearly would not be favorable to appellant's position as the term is utilized in Crim.R. 16(B)(1)(f). While appellant did not have the opportunity to review the tape himself or have the trial court review the tape to verify the accuracy of the testimony provided, such is not warranted under the circumstances. Appellant made a general discovery request for all materials which were within the scope of Crim.R. 16(B). Having failed to make any specific request, the prosecution is granted the authority to determine that which is in its possession and which is exculpatory in nature. Lawson and Ritchie, supra. Furthermore, the prosecutor's decision as to exculpatory evidence in his possession is final absent a specific request by defendant for particular items. Id. Since appellant did not, make any such request, it cannot be held that the prosecutor failed to turn over evidence which was favorable to appellant's position.
Appellant was similarly unable to establish that appellee failed to produce evidence in its possession which was material to the issue of guilt or punishment. Due to the fact that the video surveillance tape was not favorable as it did not depict appellant, said evidence cannot be viewed as material to appellant's case. As previously discussed, it is appellant's duty to illustrate that a reasonable probability exists that the jury would have arrived at a different conclusion if the video surveillance tape had been admitted into evidence. Kyles, supra. Moreover, it must be shown that appellant was denied a fair trial and the confidence of the trial was undermined as a result of the absence of the evidence in question. Id. Appellant does not explain nor can this court fathom how the exclusion of the video surveillance tape had any detrimental effect on the validity of the trial court proceedings. In light of the testimony provided by Agents Kopfer and Mroczkowski as to the contents of the video surveillance tape, providing the tape to appellant and admitting it into evidence at trial would have served only to solidify appellee's case against appellant. Absolutely no benefit would have been gained as related to establishing an alibi.
Having failed to persuade this court that the suppressed evidence was either favorable or material, appellant is unable to show that the prosecution erred when it did not disclose the evidence or that the trial court erred when it permitted testimony related to the tape. Therefore, appellant's fifth assignment of error is held to lack merit.
 VII. ASSIGNMENT OF ERROR NUMBER SIX
Appellant's sixth assignment of error reads:
 "THE TRIAL COURT ERRED BY RE-INSTRUCTING THE JURY AFTER THE JURY RETIRED FOR DELIBERATIONS AND AFTER THE PROSECUTOR AND DEFENDANT AGREED IN A PRIOR IN CHAMBERS CONFERENCE TO THE FINAL JURY INSTRUCTIONS AND VERDICT FORMS. THE RE-CHARGE OF THE JURY WAS PREJUDICIAL, COERCIVE, AND AN ABUSE OF DISCRETION AND DENIED THE APPELLANT A FAIR TRIAL GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND BY ARTICLE I, SECTION 10 AND 16 OF THE OHIO STATE CONSTITUTION."
Under appellant's sixth assignment of error, it is asserted that the trial court erred when it called the jury back into the courtroom after it had already begun deliberations. Appellant contends that at the close of evidence counsel for both parties met with the trial judge and approved final versions of the jury instructions and verdict forms. However, after the jury retired for deliberations, the prosecutor asked for the jury to be brought back in and advised of an additional verdict form. Apparently a verdict form had not been prepared relating to the firearm specification on the lesser included offense of murder. The trial court granted the prosecutor's request and advised the jury in open court on such. It is appellant's belief that Statev. Howard (1989)., 42 Ohio St.3d 18 stands for the proposition that a trial judge may only re-instruct a jury if the jury is deadlocked on the issue of guilt. By having the jury called back into the courtroom after deliberations had already started, appellant argues that the trial court abused its discretion and denied him his right to a fair trial.
 A. APPLICABLE LAW
A review of the relevant case law reveals that appellant's interpretation of Howard is incorrect. Despite appellant's contention that the case stands for the proposition that a jury may only be given supplemental instructions in the event of a deadlock, such is not the case. The Ohio Supreme Court succinctly delineated the issue to be resolved in Howard when it stated:
 "The sole issue before this court is whether the supplemental jury instruction given to the jury on July 31, 1981 was coercive in the sense that it pressured members of the jury who were in the minority to abandon their positions." Id. at 20-21.
During the course of the court's reasoning in Howard, it was never concluded that a trial court was so restricted as to when it may re-instruct a jury once deliberations had started. On the contrary, the court dealt only with the issue of whether a "dynamite" instruction given to a deadlocked jury was so coercive as to deny the defendant a fair trial.
In contrast to appellant's opinion as to when a trial judge may or may not re-instruct a jury, the courts of Ohio have consistently held that a trial court may re-instruct so long as the defendant and/or his counsel are present when such occurs. As the Ohio Supreme Court indicated in State v. Abrams (1974),39 Ohio St.2d 53, a criminal defendant has the right to be present whenever a trial judge communicates with the jury regarding the court's instructions. Id. at 56. However, the court went on to say that in the event the trial judge communicates with the jury without the defendant's knowledge and said communication consists solely of a reiteration of the previously given instruction, any error is harmless in nature. Id. The court expounded upon this principle in State v. Schiebel (1990), 55 Ohio St.3d 71 when it held that a defendant has a fundamental right to be present when a court gives additional instructions to the jury after deliberations are under way. Id. at 90 citing State v. Grisafulli
(1939), 135 Ohio St. 87 and Sweet v. Clare-Mor Camp Inc.(1987),38 Ohio App.3d 6, 9.
In Sweet, the Eighth District Court of Appeals had similarly held that it was error for a trial court in the absence of counsel for the parties to give additional instructions to the jury after it had retired to deliberate. Id. at 9 citing Hrovatv. Cleveland Ry. Co. (1932), 125 Ohio St. 67. The court did however acknowledge that circumstances could exist where communications between the judge and the jury following deliberations could be viewed as harmless. Id.
 B. ANALYSIS
A review of the record reveals that the following events transpired as related to the jury instructions. At the close of the presentation of evidence, the jury was excused for the day and was advised that closing statements would be given the following morning. Following a brief discussion with the defendant regarding his decision not to present evidence or testimony on his own behalf, the trial court provided counsel for both parties a copy of the written jury instructions which it had prepared for the case. At the request of the trial court, both attorneys reviewed the instructions and provided the court with their suggestions prior to leaving the courthouse. During the discussion with the trial court regarding the instructions, the prosecutor advised the trial court that a separate verdict form would need to be added for the lesser included offense of murder in case the jury would find appellant not guilty of the aggravated murder charge. No objection was raised by counsel for appellant at that time.
The following day counsel for both parties were provided copies of the final jury instructions and verdict forms in order to follow along as the court read them to the jury. Closing arguments were made and the trial court proceeded to instruct the jury. During the reading of the instructions, the trial court clearly instructed regarding the firearm specification as it related to the lesser included offenses of murder. The trial court concluded its instructions at 12:20 p.m. and the jury retired to deliberate. At this point, the prosecutor immediately brought to the court's attention that the verdict form for the lesser included offense of murder did not contain the firearm specification of which the jury had been verbally instructed. While counsel for appellant objected to any change in the forms, the prosecutor pointed out that he had never stipulated to the murder verdict form as he had not been presented with such at the time the parties reviewed the jury instructions. The trial court agreed that the verdict form should be modified to add the firearm specification. As such, the jury was called back into the courtroom at 1:00 p.m. and was briefly advised of the change.
For a number of reasons these events cannot be characterized as having denied appellant a fair trial. First, the procedure as set forth by the Ohio Supreme Court in Schiebel and Abrams was complied with in the case at bar. This court has not been presented with a situation whereby the trial judge had communications with the jury outside the presence of counsel. On the contrary, counsel was clearly advised on the record of the steps which the trial court was going to take and was provided the opportunity to be present when said steps were taken. Therefore, the trial court's actions are not of the nature previously anticipated by the Ohio Supreme Court which would equate to a denial of appellant's right to a fair trial. Schiebel
and Abrams, supra.
Appellant's argument is deflated further when one comes to the realization that the trial court's brief discussion with the jury subsequent to the start of deliberations did not make any substantive changes to the law as it had previously been stated; Appellant is unable to illustrate to this court as to how the trial court altered or misstated the law to his detriment. In actuality, all the court accomplished by re-instructing the jury was to have the verdict form on the lesser included offense comply with the law as it was given in the court's original instruction. A second instruction of this type which goes solely to an omission on a verdict form is hardly sufficient to qualify as a coercive measure by the trial court which adversely impacted appellant's right to a fair trial. It is questionable as to whether such an action by a trial court even qualifies as a supplemental instruction. This is especially the case in light of the fact that the jury had only deliberated a total of forty minutes prior to being called back into the courtroom.
Finally, if any error could be perceived in the trial court's actions, it is harmless rather than prejudicial. This must be the case as appellant was not even found guilty on the lesser included offense of murder. Therefore, the trial court's addition of the firearm specification to the verdict form never played a role in the outcome of the verdicts or in appellant's ultimate sentence.
Based upon the foregoing discussion, this court holds that the trial court did not err in its actions. Re-instructing the jury was wholly appropriate and did not result in any prejudice to appellant.
 VIII. ASSIGNMENT OF ERROR NUMBER SEVEN
Appellant's seventh assignment of error reads:
 "THE CONVICTION FOR ROBBERY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
In appellant's final assignment of error, it is alleged that there was no evidence present at trial which supported an aggravated robbery conviction. Appellant contends that because there were no eyewitnesses to the crime and there was no evidence that the victims were carrying their wallets or money on the day of the crime, appellee was unable to establish all the requisite elements for an aggravated robbery conviction. Therefore, appellant is of the belief that the jury clearly lost its way and the aggravated robbery convictions are unsubstantiated.
 A. APPLICABLE LAW
As this court has indicated on numerous occasions in the past, weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." State v. Clemons
(1998), 82 Ohio St.3d 438, 444 quoting State v. Thompkins (1997),78 Ohio St.3d 380, 387. Reviewing courts will not reverse a decision on manifest weight grounds unless after evaluating the record, weighing the evidence and the inferences that can be reasonably drawn therefrom, and considering the witnesses' credibility, the court determines that the trial court "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."Thompkins, supra quoting State v. Martin (1983), 20 Ohio App.3d 172,175. Only in exceptional cases where the evidence weighs heavily against the conviction should the court grant a new trial on manifest weight grounds. Id. In contrast to a sufficiency review, an appellate court in deciding whether a conviction is against the manifest weight of the evidence is not required to view the evidence in a light most favorable to the prosecution but rather should determine whether the prosecution has carried its burden of persuasion. Id. at 390.
Moreover, an appellate court must keep in mind that despite the above noted standard, the determination regarding witness credibility is primarily for the trier of fact. State v. Hill
(1996), 75 Ohio St.3d 195, 205 citing State v. DeHass (1967),10 Ohio St.2d 230, 231. The rationale behind this precedent is that the trier of fact occupies the optimal viewpoint for observing and assessing the demeanor of the witnesses as they testify.Myers v. Garson (1993), 66 Ohio St.3d 610, 615; Seasons Coal Co.v. Cleveland (1984), 10 Ohio St.3d 77, 80.
 B. ANALYSIS
In the present case, appellant challenges the weight of the evidence as related to the two aggravated robbery convictions. Said convictions were obtained pursuant to R.C. 2911.01(A)(3) which sets forth the elements of aggravated robbery as follows:
 "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
* * *
 (3) Inflict, or attempt to inflict, serious physical harm on another."
A review of the record substantiates the jury's finding that appellee had presented adequate evidence so as to warrant a finding of guilt on the aggravated robbery charges. Clearly the fact that both victims were murdered suffices to meet the element that serious physical harm was inflicted. Both Drs. Isam Tabbah, who was covering for the coroner when the bodies were discovered, and Marvin Platt, the medical examiner responsible for the autopsies, opined that both victims died as the result of complications from gun shot wounds to the back.
As to the issue of whether a theft offense was committed, multiple parties testified regarding their presence during the search of appellant's car. BCI Agent Michael Kopfer testified that he participated in the search of the trunk of appellant's vehicle. At that time, two pairs of binoculars were found. Ronald Myers of the Harrison County Sheriff's Department also testified that he was present at the search of appellant's vehicle and witnessed two pairs of binoculars being inventoried from the contents therein. The ownership of the two pairs of binoculars was established through testimony from various relatives of the victims. Matthew Clemens, Duane Lockard's grandson, identified the one pair of binoculars as belonging to his grandfather. Matthew further testified that his grandfather never hunted without his binoculars. It was Matthew's recollection that he personally had used the binoculars approximately two weeks prior to his grandfather's death. Jean Lockard, Duane Lockard's wife, also testified regarding her husband's binoculars. Mrs. Lockard testified that she recalls seeing the binoculars hanging in the stairwell one week prior to her husband's death.
In regards to the second pair of binoculars, Robert Lockard, William Lockard's son, identified them as belonging to his father. It was additionally Robert's opinion that his father always had his binoculars with him and would not hunt without them. Furthermore, Robert believed that his father would not lend his binoculars to defendant or anyone else in light of the fact that he used them so frequently. The combined effect of this testimony directly contradicts the statements made by appellant on November 8, 1997 to Sheriffs Miller and Abdalla at the Tuscarawas County Jail. Sheriff Abdalla testified that appellant made mention of only one pair of binoculars in his trunk and those had been given to him three months previously by one of the victims. No explanation was offered by appellant for the second pair of binoculars.
In light of this testimony in conjunction with the physical presence of the binoculars in appellant's trunk, this court is not in a position to hold that the jury's verdict was against the manifest weight of the evidence. Testimony was provided that neither victim would hunt without his binoculars. Furthermore, witness testimony placing Duane Lockard's binoculars at his home within one week of the murders directly conflicts with appellant's statement that they were lent to him three months previously. Additionally, Robert Lockard's statement that his father would never lend his binoculars to another individual serves to further discredit appellant's statement. The testimony regarding the binoculars alone is sufficient to establish that the jury did not lose its way in arriving at the guilty verdict. No contrary evidence or testimony was presented which would serve to combat the evidence provided by the state. Therefore, this court is not in a position to substitute its judgment for that of the jury. Thompkins, supra.
In addition to the testimony surrounding the binoculars, Mrs. Lockard testified that she witnessed her husband place several thousand dollars in his wallet prior to leaving on the hunting trip in October 1997. Moreover, Sheriff Miller testified that no wallets, money or identification were found on either of the two bodies. However, the pockets of both victims had been pulled out as if the contents therein had been removed. While appellant takes issue with the fact that no money or wallet was ever recovered from him, the fact that no wallets were found on the victims in conjunction with the testimony from Mrs. Lockard and Sheriff Miller gives rise to a reasonable inference that a theft occurred.
The Ohio Supreme Court has held on a number of occasions that circumstantial evidence of this nature provides the appropriate level of proof so as to permit a reasonable jury to conclude that a defendant played a role in a theft offense. In State v. Palmer
(1997), 80 Ohio St.3d 543, the court was presented with circumstances similar to those in the case at bar. The evidence in Palmer suggested that the victims had been deprived of their wallets and personal belongings however these items were never recovered. Nonetheless, the court held that reasonable inferences derived from the evidence could permit a rational trier of fact to conclude that the defendant had committed an aggravated robbery offense. Id. at 571.
The court came to a similar conclusion when it decided State v.Davis (1996), 76 Ohio St.3d 107. In that case, the husband of the victim testified that his wife habitually wore a combination engagement and wedding ring as well as a Rolex watch. However, the husband was not able to testify from personal knowledge that his wife wore these particular items on the day she was murdered. Despite this fact, the court held that a jury could reasonably infer that a theft offense had occurred in light of the fact that a murder did occur and the particular items were never recovered.Id. at 115. The court concluded that the circumstantial evidence in addition to the inferences which arose therefrom provided ample support for a jury to find beyond a reasonable doubt that a theft offense had taken place. Id.
Based upon the sum total of the evidence and testimony which favored a conviction, it cannot be held that the evidence weighed heavily against appellant's convictions for aggravated robbery. Hence, this court cannot hold that the jury clearly lost its way. Appellant's final assignment of error lacks merit.
In summation, all of appellant's assignments of error are overruled with the exception of assignment of error number two.
For the foregoing reasons, the decision of the trial court is affirmed in part, reversed in part and remanded for the sole purpose of re-sentencing so that appellant's sentence complies with R.C. 2929.19.
Donofrio, J., Waite, J., concurs.
APPROVED: ________________________________ JOSEPH J. VUKOVICH, JUDGE.